LANG ET AL. *v.* UNITED STATES (No. 2019).[1]

1. MERCHANDISE MANUFACTURED TO ESCAPE DUTY.

An importer has the right to fashion his merchandise so that it shall be assessed with duty at the lowest rate.

2. PARAGRAPH 461, TARIFF ACT OF 1913—REGULUS OF COPPER—COPPER MATTE.

That the provision of paragraph 461, tariff act of 1913, for regulus of copper includes copper matte of any lead content less than its predominant component in value is *stare decisis*, regulus and matte being synonymous.

3. CONSTRUCTION, PARAGRAPH 461, TARIFF ACT OF 1913—ALL PARTS OF STATUTE˙ TO BE GIVEN EFFECT—COPPER.

In order to give effect to all the provisions of paragraph 461, tariff act of 1913, it is necessary to construe it as according free entry to all copper ores and all products of them in whatever shape and whatever form produced short of manufactures of copper.

4. CONSTRUCTION, PARAGRAPH 461, TARIFF ACT OF 1913—AIDED BY CONTEXT— LEADY COPPER MATTE.

In paragraph 144, tariff act of 1913, Congress provided for "Matte containing antimony but not containing more than 10 per centum of lead."  Consideration of this, together with the provision of paragraph 461 for copper regulus without any limitation as to lead content—Congress being fully informed that matte and regulus were commercially and legally synonymous—makes obvious the congressional intention that paragraph 461 should embrace copper matte of any lead content.

4. CONSTRUCTION, PARAGRAPH 152, TARIFF ACT OF 1913—"LEAD-BEARING ORES."

Copper matte is not an ore but a product of an ore and a leady copper matte can not be classified under paragraph 152, tariff act of 1913, as a lead-bearing ore.— United States *v.* Consolidated Kansas City Smelting & Refining Co. (8 Ct. Cust. Appls., 226; T. D. 37495) distinguished.

[1] T. D. 38563 (38 Treas. Dec., 799).

5. CONSTRUCTION, PARAGRAPH 153, TARIFF ACT OF 1913—LEAD—COMPONENT
   MATERIAL OF CHIEF VALUE.—*Ejusdem Generis.*—"Lead in Any Form."
   Under the general rule that merchandise is classified with reference to the component material of chief value, a matte in which *copper* predominates in value can not be classified under paragraph 153, providing for "Lead dross, lead bullion, or base bullion, lead in pigs and bars, lead in any form not specially provided for." Moreover, "lead in any form" includes only lead forms *ejusdem generis* with those named.—United States *v*. Consolidated Kansas City Smelting & Refining Co. (8 Ct. Cust. Appls., 226; T. D. 37495), and a matte is not such.

6. LEADY COPPER MATTES.
   Copper mattes with substantial lead contents, the copper, however, being more valuable than the lead, are classifiable under the provision for regulus of copper in paragraph 461, tariff act of 1913, and not as lead-bearing ores under paragraph 152 or as lead in any of the forms named in paragraph 153.—United States *v*. Consolidated Kansas City Smelting & Refining Co. (8 Ct. Cust. Appls., 226; T. D. 37495), distinguished.

United States Court of Customs Appeals, December 3, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8298 (T. D. 38176).
   [Reversed.]

*Gerry & Wakefield* for appellants.

*Bert Hanson*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.

[Oral argument Mar. 25, 1920, by Mr. Gerry and Mr. Baldwin.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

[Oral reargument Oct. 27, 1920, by Mr. Gerry and Mr. Baldwin.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal concerns certain importations of a metallic composition from Mexico entered at the port of El Paso, United States. The importations were of so-called "matte" varying in quantitative percentages of copper content from 22 to 52 per cent and in similar lead content from 17 to 57 per cent. Some contained gold, silver, platinum, or iridium. In each and all the copper was greater in value than the lead content. They were all classified for duty purposes by the collector of customs at the port of El Paso, except that covered by protest 809116, as "lead in any form" under paragraph 153 of the tariff act of 1913. That covered by protest 809116 was classified as a lead-bearing ore under the provisions of paragraph 152 of said act. In so far as pertinent these paragraphs read:

152. Lead-bearing ores of all kinds containing more than 3 per centum of lead, ¾ cent per pound on the lead contained therein; * * *

153. Lead dross, lead bullion or base bullion, lead in pigs and bars, lead in any form not specially provided for in this section, * * * 25 per centum ad valorem, on the lead contained therein.

They are claimed free of duty under paragraph 461, current act, and particularly as regulus of copper as that term is used in that paragraph of said act hereinafter quoted. The correct interpretation of that term as so used will be aided by consideration thereof

as it appeared and was interpreted in earlier tariff acts. Its first legislative appearance seems to have been as a member provision of the tariff act of 1883. Thereafter it appeared in all such acts to and including the current import tariff act of 1913 in substantially the same language. We quote from the several acts:

Tariff act of 1883 —

186. Copper, imported in the form of ores, 2½ cents on each pound of fine copper contained therein; regulus of and black or coarse copper and copper cement, 3½ cents on each pound of fine copper contained therein; * * * .

Tariff act of 1890—

193. Regulus of copper and black or coarse copper, and copper cement, 1 cent per pound on each pound of fine copper contained therein.

Tariff act of 1893 —

453. Copper, regulus of, and black or coarse copper, and copper cement. (Free list.)

Tariff act of 1897 —

534. Copper, regulus of, and black or coarse copper, and copper cement. (Free list.)

Tariff act of 1909—

544. Copper ore; regulus of, and black or coarse copper, and copper cement; * * *. (Free list.)

Tariff act of 1913 —

461. Copper ore; regulus of, and black or coarse copper, and copper cement; * * . *. (Free list.)

The appearance of the term "regulus of copper" in the act of 1883 was no doubt prompted by the investigations and report of the Tariff Commission which was the foundation of that act. When Mr. L. McMullen, examiner of ores and metals at the appraiser's office, New York, was before the commission the following colloquy, on August 15, 1882, occurred (Report of the Tariff Commission, 1882, vol. 1, 443):

Commissioner McMahon. What do you say in regard to regulus of copper? We had some trouble years ago in regard to that black copper; there was difficulty in ascertaining the fine copper that was contained in the black copper. What do you say also in regard to copper in plates, bars, ingots, and pigs?

The Witness. Very little of that comes into this country; in fact, it is exported to the other side. Perhaps this 5 cents a pound duty may be the cause of its not being imported; but I know as a fact that it is not imported. We used to have a large quantity of the regulus of copper coming from South America, but we do not have any at all now. Perhaps it would be well to let that remain as it is.

Commissioner Garland. Do you think the regulus of copper fails to be brought in on account of the high tariff?

The Witness. I suppose it is excluded on the ground that the duty is too high.

So that the term "regulus of copper" was one known to the customs officials, Congress, and of necessity the trade importing and dealing in the same for some time prior to August 15, 1882. That "regulus of copper" as then known contained other elements than

copper is made obvious by the fact that both the tariff acts of 1883 and 1890 laid duty upon the copper content of regulus of copper and not upon the entirety. This limitation evidenced a further purpose of Congress to make dutiable only the *copper content* of regulus of copper, leaving, so far as appears by that provision, the associate contents nondutiable, a purpose which was further significantly evidenced by the fact·that in the act of 1894 and all subsequent acts, including the current law, wherein regulus of copper is transferred to the free list, the language of Congress is changed, giving free entry not alone to the *copper content* of regulus of copper, but to "regulus of copper," whatever that term may include in its instant legislative scope.

The question of the dutiable status of "matte" under the term "regulus of copper" under the act of 1883, supra, was raised and decided by the Treasury Department in July, 1889, holding that "the question has been further investigated, and it is ascertained that 'matte' and 'regulus of copper' are synonymous terms." (T. D. 9528.)

In May, 1890, the question was again raised and it was declared by the same authority that "Synopsis 9528, wherein 'matte' and 'regulus' are declared to be synonymous terms, is hereby affirmed." (T. D. 10043.)·

The two former rulings of the Treasury were more fully illuminated by that of August 27, 1890 (T. D. 10173), as follows:

SIR: The department is in receipt of your letter of the 20th instant, in which you request to be advised as to the proper classification of certain so-called copper matte of the following composition: Copper, 30.96 per cent; lead, 24.25 per cent; iron, 16.95 per cent; sulphur, 26.84, and 78⅔ ounces of silver per ton of 2,000 pounds.

From the above composition it would seem that the mass in question is correctly designated as copper matte, a product of smelting, and not a natural ore.

The department, as at present advised, is inclined to the opinion that in view of its rulings recognizing "matte" and "regulus" as synonymous terms (Synopses 9528 and 10043), said merchandise should be classified as regulus of copper, subject, under T. I., 186, to a duty of 3½ cents per pound of pure copper contained therein.

In all of the foregoing controversies, be it remembered that regulus of copper was dutiable as to its *copper content,* and the Government was insisting and *established* upon investigation that "matte" and "copper matte" were included within the term "regulus of copper," as used in the then current tariff act, even though, as in the last quoted decision, the lead content was 24.25 per cent.

Meanwhile the Board of General Appraisers was created and the tariff acts of 1883 and 1890 superseded by that of 1894. In the latter act "regulus of copper" was transferred to the free list, paragraph 453, in the exact phraseology as it appeared in the preceding acts (186, act of 1883), (193, act of 1890).

The issue seems first to have been presented to the board in February, 1896, under the act of 1894. "Copper matte" containing

$12\frac{8}{10}$ per cent of copper was claimed free as "regulus * * * of copper." The issues there presented and testimony introduced are so like this case in many particulars that we quote from G. A. 3394 (T. D. 16966), as follows:

It appears from the testimony that while copper matte and regulus are not precisely similar, regulus being the product after the sulphur has been extracted from the matte, the terms are substantially and commercially synonymous. Matte is the last of the several intermediate stages between the ore and regulus.

It is also in evidence that lead is an objectionable and not a valuable component, as it retards the extraction of the copper and is generally lost by volatilization.

The department has, at various times, held as follows:

In synopsis 9528 that copper in nickel matte was dutiable as copper regulus. In synopsis 10043 the importer claimed that the article was not regulus of copper, but the department found that it was "a matte or regulus," and held it should be assessed for duty in accordance with synopsis 9528, "wherein matte and regulus are declared to be synonymous terms." This ruling was again affirmed in synopsis 10173.

These rulings, which prevailed under the acts of 1883 and 1890, are entitled to much weight; and there appears to be no reason why the term "regulus" should be given a narrower scope in the tariff of 1894, in which all forms of unmanufactured copper are placed on the free list.

We find—

(1) That the merchandise is copper matte.

(2) That within the meaning of the tariff copper matte and copper regulus are synonymous terms.

Following the foregoing, the tariff act of 1897 was enacted. The provision of the free list therein for "copper, regulus of" was reenacted in all essential respects as in the previous acts of 1883, 1890 and 1894. The dutiable provision for lead, in so far as here pertinent, however (par. 181) therein read: "Lead-bearing ore of all kinds, one and one-half cents per pound *on the lead contained therein.* * * *" The Treasury Department noting the distinction that while previous acts laid duty upon "lead ores" the act of 1897 laid it upon the *lead content* of "lead-*bearing* ores of all kinds," directed assessment thereunder upon the lead content of certain "so-called copper matte" arriving at the port of El Paso, Tex., containing "respectively, 28.66, 25.30, and 25.16 per cent of lead, and 35.32, 33.34, and 33.40 per cent of copper." The opinion of the Treasury reviewed all the decisions to that date and predicated its decision upon the changed language of the dutiable provision of the act of 1897 (T. D. 19777). The importers brought the matter before the Board of General Appraisers, G. A. 4308 (T. D. 20326). The gist of the board's decision was as follows:

The department said in synopsis 19777:

As it was clearly the intention of Congress to place a duty on all lead contained in lead-bearing ores, it is the opinion of this department that the instructions addressed to you under date of the 19th instant, directing that the various percentages of lead contained in the importation be assessed with duty at the rate of $1\frac{1}{2}$ cents per pound under paragraph 181, fully carry out the intent of Congress. Such decision in no way affects the copper contained in the importation, which is admitted to free entry, as directed by Congress.

Paragraph 181 provides only for "lead-bearing ores of all kinds." We find that the merchandise is not an ore of any kind, and we hold that it is not covered by paragraph 181.

The provision of paragraph 534 for copper regulus is an exact reproduction of the corresponding provision of paragraph 453 of the act of 1894.

It does not seem to be disputed that the copper matte in question is copper regulus, and, following G. A. 3394, the protest is sustained.

On appeal to the United States Circuit Court for the District of Colorado, Spencer *v.* Philadelphia Smelting & Refining Co. (124 Fed., 1002), this decision of the board was affirmed. *The Circuit Court, however, further held that not only was the importation not within paragraph 181 as an ore, but also that it was free as regulus of copper.* The court pertinently said:

Paragraph 181, schedule C, section 1, chapter II, tariff act July 24, 1897, 30 Stat., 166 (U. S. Comp. St., 1901, p. 1644), makes dutiable "lead-bearing ore of all kinds" at the rate of one and one-half cents per pound on the lead contents thereof. Paragraph 534, free list, section 2, of the same act of 1897, 30 Stat., 197 (U. S. Comp. St., 1901, p. 1682), puts on the free list copper regulus, and the question submitted is whether this copper matte is copper regulus. It appears that the copper matte contained about 25 per cent lead and about 34 per cent copper, and that it is not an ore in any strict sense of the term, but is a product of smelting. On the hearing before the Board of Appraisers, the witnesses were unanimous to the effect that, as used commercially, copper regulus and copper matte mean the same thing. The recent scientific authorities, also, as quoted by them, define copper matte as synonymous with copper regulus. Perhaps a few years ago there was a slight distinction between the two. Copper matte always contains sulphur. When freed of this sulphur, it would become copper regulus. But this distinction has been abandoned in recent years, and both commercially and scientifically they have been used as synonymous terms. The Government introduced no witnesses before the board disputing this fact. In the tariff act of March 3, 1883 (22 Stat., 488), copper regulus was dutiable. It then became a question as to whether a matte of nickel and copper was a copper regulus under that act, and the Treasury Department held that it was in fact copper regulus, and was dutiable under the provisions of the act. After the act of 1894 was passed, copper regulus was put on the free list. The question then arose in the Treasury Department as to whether a matte containing lead and copper, similar to the particular matte here, was copper regulus, and it was held by this board of general appraisers that it was copper regulus, and was entitled to be admitted free of duty. In re American Metal Co. (G. A. 3394). This ruling was adopted by the Treasury Department, and adhered to by it. This ruling was, of course, or must be presumed to have been known by Congress when it passed the tariff act of 1897. *It has placed on the free list copper regulus in a paragraph in the same words as that of the tariff act of 1894. It must be presumed that it was done in view of the fact that copper matte and copper regulus had been determined to be the same, and with the intent that copper matte should be admitted free under the paragraph.* (Italics ours.)

The Treasury Department took no appeal from this decision. On the contrary, it acquiesced therein (T. D. 21291). The Government, however, again presented the issue to the board in G. A. 5119 (T. D. 23656). The "matte" there in issue consisted of 47.64 per cent of copper and 18.43 per cent of lead. It is well to note that in this

case there were further urged upon the board the provisions of paragraph 182 of the act of 1897 as follows:

> 182. Lead dross, lead bullion or base bullion, lead in pigs and bars, *lead in any form* not specially provided for in this act, * * *. (Italics ours.)

That provision appears in the subsequent acts, 1909, paragraph 182, 1913, paragraph 153.

The issue stated by the board was as follows:

> The sole question to be determined is whether or not this merchandise is a lead-bearing ore under the provisions of said paragraph 181, or assimilates thereto, or whether it is properly dutiable as lead in any form not specially provided for in this act, under said paragraph 182, or whether or not it is included within the term regulus of copper, as used in said paragraph 534. If copper matte is properly included within the term regulus of copper it is apparent that all issues in this case are disposed of by the solution of the question: Do the words "regulus of copper" under said paragraph 534 extend to and include copper matte?

The board followed the court decision aforesaid, saying:

> The court decides that copper matte and copper regulus are synonymous terms, and are specially provided for in paragraph 534 of the free list of the act of July 24, 1897, under the enumeration for copper regulus. This conclusion of the court accords with the views of eminent authorities upon the subject.
>
> In the volume of Mineral Industries (p. 240), by R. P. Rothwell, for 1900, in an article by E. Keller, on the elimination of impurities from copper matte, the following language is used:
>
> In the United States the term matte is applied to any sulfide product obtained by smelting sulfide ores. What in England and Wales is subdivided into coarse metal, blue metal, and white metal is in this country generally described under the class name of copper matte. In a few exceptional instances, lead and nickel must be classed as essential ingredients. Regulus is the term applied to a product obtained by smelting a matte in a reverberatory furnace, the other products being copper bottoms, slag, and flue dust, the copper is still in the form of sulfide.
>
> Thorpe Dictionary of Applied Chemistry, article "Copper," applies the term "regulus" to a fused product containing not over 35 per cent copper, which is also termed coarse metal, the term metal being one applied to a regulus in the Welsh method of smelting. This regulus is further calcined, yielding blue metal with 55 per cent copper, or white metal, 75 per cent copper, while a still richer regulus is moss or pimple copper. Regulus is thus used as a designation for metallurgical products running from 20 to over 75 per cent copper.
>
> Crookes & Rohring (Practical Treatise on Metallurgy, Vol. II, p. 160) use the term "raw matte" as synonymous with regulus, or coarse metal, and again (p. 165) "raw matte" is used to denote the same article as regulus, or coarse metal.

Then followed the tariff act of 1909. The question was again raised under that act and decided adversely to the Government by the Board of General Appraisers. T. D. 34279 (Abs. 35013). The competing provisions therein were the same as herein. Therein the *lead content* ran from 17.20 per cent to 38.80 per cent. The board, in part, said:

> In the light of these rulings, and from the evidence now before us, we are satisfied that the merchandise is a matte or regulus of copper within the purview of said paragraph 544. While it is true that the analyses show high percentages of lead, and the witnesses describe the merchandise as *leady copper mattes*, still Congress has provided

free entry for copper regulus, *without limitation*, in this and prior tariff acts, notwithstanding the publication of various decisions wherein merchandise containing as high as 25 per cent of lead was declared to be entitled to free entry as copper regulus. [Italics ours.]

On appeal that decision was reviewed by this court and affirmed. United States *v.* American Smelting & Refining Company (5 Ct. Cust. Appls., 398; T. D. 34937). This court concluded its consideration of the case by the following language:

But, however that may be, it is established by the uncontradicted testimony of Ledoux and Colcord that mattes containing the percentages of copper, lead, iron, and sulphur found in the importation were known to the wholesale trade of the country and designated by it at and prior to the passage of the tariff act of 1909 as copper mattes. To the same effect was the testimony of Willet S. Morse, executive officer of the Perth Amboy branch of the American Smelting & Refining Co. and a Government witness, who stated that the goods imported were copper mattes containing lead.

In our opinion, the goods involved in this appeal are copper mattes and are entitled to free entry as regulus of copper, inasmuch as the terms "copper mattes" and "regulus of copper" have admittedly come to mean the same thing.

The current tariff act having become operative in 1913, the question, which was decided by this court upon a substantially different record, was again presented. The board adhered to its previous holdings, pointing out that the competitive provisions of the law were substantially the same and overruled the Government's contentions. G. A. 7911 (T. D. 36439). The Government appealed to this court. As the record in that appeal is made by stipulation a part of this record, and as thereby there is herein fully amplified the situation prompting the decision of this court in United States *v.* Consolidated Kansas City Smelting & Refining Co. (8 Ct. Cust. Appls., 226; T. D. 37495), (hereinafter referred to as the "Consolidated Co."), as well as supporting this decision, we will set forth in some detail the salient facts therein established.

Let us bear in mind that the entire controversy grows out of the contention as to whether or not the lead content of copper matte is dutiable under the provisions of the tariff law, (1) levying duty upon lead "ore" and the "lead contained therein," as provided by 152 of the present act (exceeding 3 per cent), or, (2) those levying duty upon lead dross, lead bullion, lead in pigs and bars and "*lead in any form*," as provided by paragraph 153 thereof, or, is free of duty under paragraph 461 as "*copper ore; regulus of, and black or coarse copper, and copper cement.*" The crux of the contention is the dutiability of the lead contained in this copper matte.

It may be taken as true that the amount of the lead content recoverable from *matte* differs according to the quality of the *matte* and the character of the smelter treating the same. Unquestionably the smelters of the Irvington Smelting & Refining Works at Irvington, N. J., appearing in this case, can not recover as much of the

lead content of *matte* as can the more modern works of the American Smelting & Refining Co. at Chihuahua and El Paso, parties in the earlier case. It is probably the gradual progress and development of this branch of smelting operations, whereby a greater percentage of lead is so recoverable, that has prompted much of the litigation hereinbefore delineated. In the earlier history little if any of the lead in copper "matte" was recoverable in commercial quantities and value. Later, however, it is undoubtedly possible in the more modern plants to commercially recover much of the lead. Consequently that *matte*, which might be treated at one smelting plant for the lead content and thus be made ready for copper smelting, would not be so treated at another plant, but, nevertheless, would be smelted for its copper content with consequent greater sacrifice of lead values. While this fact is made clear in this record it was not satisfactorily shown in the record before the court in the Consolidated Co.'s case, supra. One reason for this difference lies in the fact that not at all smelting plants are there combined both lead and copper smelting plants. It is agreed that the best matte for copper smelting is that from which all the lead possible has been extracted. Bearing upon this point it is significant to note that the Consolidated Co.'s plants at Chihuahua and El Paso were particularly well equipped for these operations. There is a lead smelting works of modern type at both points.

According to the testimony of Mr. J. R. Enlow, superintendent of the Chihuahua plant, and this seems conceded by all, it is possible by regulating the "charge" to approximately regulate the lead content of the *matte*. He testified that the matte produced at Chihuahua has been at times about 10 per cent lead; that "we do our best at all times to get it less than 15 per cent." He further testified:

Q. Mr. Enlow, what is the minimum content of lead and the maximum content of lead as well as the minimum content of copper and the maximum content of copper in the copper mattes which you ship?—A. Which we ship or which we produce?

Q. Which you ship?—A. Well, I don't—I can't remember what the contents were. I don't know what they were. My memory is about 6 per cent copper and an average of 12 per cent lead. I don't know exactly.

Q. What is the highest content of lead that you know of in a copper matte?—A. Well, we have produced as high as 30 per cent ourselves from a bad reduction.

\*        \*        \*        \*        \*        \*        \*

Q. What is the highest per cent of lead, the highest lead content in any mattes which you produce?—A. I have produced mattes over 30 per cent lead, I am sorry to say.

Mr. H. R. Wagner, general manager of the "Southern Department, American Smelting & Refining Co.," having the Chihuahua plant under his jurisdiction, testified as to the *matte* produced thereat:

Q. Do you know, Mr. Wagner, what the ordinary percentage of lead would be in that matte?

\*        \*        \*        \*        \*        \*        \*

A. That is a question? You [are] asking me for something I can't tell you offhand. There is a large difference, a wide range. We were making mattes that ran from 7% to 12% to 15% in lead. In the same day one furnace will make a matte 7% lead, and another make one with 18 per cent.

Q. 18 per cent lead?—A. In the matte, under different furnace conditions. You take them out and mix them up—it depends on how many bad furnaces you have got what the amount is. If it is all open, and goes right through we have made it as low as 7%.

Q. What would be the highest?—A. I have seen 30%.

Mr. James Heggie, superintendent of The Consolidated Co.'s plant at El Paso, testified in that company's case, supra, that thereat they used a formula worked out by experience to determine the commercial practicability of what matte should first be treated in the lead department to extract the lead content before treatment in the copper department. He stated the formula as follows:

Q. Both ores and mattes are treated in the lead department of the El Paso plant?— A. Yes, sir.

Q. And both ores and mattes are treated in the copper department of the El Paso plant?—A. Yes, sir.

Q. What is the difference in the general character of the ores and mattes treated in one department of the plant, and those treated in the other department?—A. It depends upon whether it is commercially advantageous to treat in one or the other department.

Q. If it is more profitable to treat a matte in the copper department than to treat it in the lead department, it is sent to the copper department?—A. Yes, sir.

Q. And if it is more profitable to treat it in the lead department, it will be sent to the lead department?—A. Yes, sir.

Q. Is a record made at that plant by which you can afterwards tell whether a given shipment of matte was sent from the one department to the other department for treatment?—A. Always.

    \*        \*        \*        \*        \*        \*        \*

Q. Have you any formula by which you determine whether a given matte shall be sent to one department or to the other?

    \*        \*        \*        \*        \*        \*        \*

A. Yes, sir; we have a working formula to go by.

Q. What is that formula?

    \*        \*        \*        \*        \*        \*        \*

Q. How was that formula determined upon, scientifically or as a result of experience?

    \*        \*        \*        \*        \*        \*        \*

Q. That formula was figured out by Mr. Doerr on the result of previous experience at the plant and, on cost of smelting, and various things that entered in, as to it was commercially profitable.

Q. State what the formula is.

    \*        \*        \*        \*        \*        \*        \*

A. Well, we take and divide the percentage of copper by four and deduct that result from the amount of lead contained in the mattes, and if, after that deduction, there is more than seven units or seven per cent of lead in that matte, we generally run it through the lead department. If there is less than that, we send it to the copper.

The instructions under which the Chihuahua and El Paso plants were operating are set forth in a letter addressed to the then Assistant

Secretary of the Treasury in charge of customs by Mr. Edward Brush, of New York, in part as follows:

American Smelting & Refining Co., 165 Broadway, New York, Jan. 5, 1912.   Daniel Guggenheim, president.   Edward Brush, vice president and assistant to the president.

\*          \*          \*          \*          \*          \*          \*

We are now importing such product from our Chihuahua smelter in the Republic of Mexico to our copper reverberatory plant at El Paso, Texas.   In giving recent instructions, however, with regard to this importation, I took pains to request our shippers to ship the product as regulus, and also warned them that the value of the lead in such mattes should not exceed the value of the copper.   We are assured that the shipments which are now being made will be of this class of material.

While, possibly, the by-product of smelting known as copper matte might be declared by the courts to be regulus without regard to the fact that the lead in such matte might be in excess of the copper in value, yet, except as the relative market price of copper and lead greatly change from any period of the past, it would be, in my opinion, very unusual, if not impossible, to produce a copper matte from such smelting in which the lead value would exceed the copper value.   Our reason for taking the precaution was based upon our understanding that the Treasury Department usually designates the classification of an article by the component part of the greatest value, and if lead, therefore, should be the component part of the greatest value, it might be considered lead matte rather than copper matte.

The above views are not a legal expression, but are only a review of certain facts and personal inference which might be varied by change of facts or change of information as to the law.   We understand from telephonic communication that so long as we continue to import the same class of material which has been previously imported free as regulus, the department will not take advantage of such importations to assess a duty on the lead contents without giving us 30 days' notice.   Based upon this conversation, I have wired to our Chihuahua smelter to continue these shipments so long as the lead surely is of a lesser value than the copper, and so long as it is a direct by-product of smelting.

Yours, very truly,

(Signed)          EDWARD BRUSH.

The importation, therefore, by the El Paso plant of copper mattes in many instances having a lead content of more than 30 per cent, even to over 50 per cent, in volume from the Chihuahua plant, qualified to extract the lead content of such mattes down to 10 to 15 per cent, both of said plants being dominated by or branches of the same concern, at once arrested attention.

While the Consolidated Co.'s case seems to have been tried upon the theory that the Chihuahua and the El Paso smelters, having been proven by the Government as branch plants of the same dominating concern, were loading copper matte with excessive quantities of lead for the purpose of escaping the lead duties, nevertheless, if so shown, that would not be a controlling factor here.

It is established law, as was in effect held by the Supreme Court in Merritt v. Welsh (104 U. S., 694, 701), that the importer has the legal right to so fashion his manufactures as will, under the revenue laws of the country when goods are imported, incur the least

exaction of duties, barring, of course, fraudulent practices. That court therein said:

Great stress is laid on the charge that sugars are manufactured in dark colors on purpose to evade our duties. Suppose this is true; has not a manufacturer a right to make his goods as he pleases? If they are less marketable, it is his loss; if they are not less marketable, who has a right to complain? If the duties are affected, there is a plain remedy. Congress can always adopt such laws and regulations as it may deem expedient for protecting the interests of the Government.

In view of the correspondence with the Treasury in the Consolidated Co.'s case the record discloses no more than an open, declared, and legally asserted effort on part of the importing firm to avail itself of the language of the law as interpreted by the courts. The matter therefore is one for the Congress.

The general application of the formula employed at the El Paso plant was not contested in the Consolidated Co.'s case. While there was evidence in the record that the chief value of the copper or lead content of matte determined its commercial designation, regardless of its content of precious metals, it was by that record abundantly established that the mattes at the copper-smelting department of the works at El Paso were not so ready for use or used until submitted to the test of the Heggie formula and treated accordingly, the excess lead when extracted being used in other operations by the smelter. Obviously whether the lead was used by the company itself or sold to others the principle was the same.

But this record clearly establishes, that which was not shown by the Consolidated Co.'s case, that the Heggie formula is not one of general application. It is here clearly shown that a difference in ores or labor conditions, or relative values of lead and copper, would render it inapplicable.

Operating as the Consolidated Co. then was, upon certain ores with a stable market and labor conditions, it was applicable *to the particular plant*. But the testimony in this record shows it entirely inapplicable and unknown to other plants of the country. Hence it can not be here applied. Moreover, difference in lead-smelting plants marks a difference in the lead contents of commercially profitable mattes which can be used. Thus, while it was shown in the Consolidated Co.'s case that the mattes produced for that plant at Chihuahua usually ran between 10 and 15 per cent lead and rarely reached 30 per cent of lead, the following was testified in this case by Mr. Karl Bachofner, superintendent of the Irvington plant:

Q. Then in general you have two courses—one is to smelt direct for the copper and the other is to smelt first for the lead and than subsequently for the copper?—A. Yes, sir.

Q. Is that all you do at the Irvington plant?—A. We refine the precious metals, of course.

Q. That is a subsequent operation?—A. Yes.

Q. But, independent of the subsequent refining operation, those two main operations are all you ever do with any of your mattes?—A. Those are the first operations, except sampling, of course. Those are the first smelting operations.

Q. How much lead do you require in order to make it advisable for you to put them through your lead-smelting operations?—A. I would say around 40 per cent, maybe 35.

Q. You would sometimes take a matte that had considerably less than 40 per cent of lead and mix it with something that had more, so as to produce an average of 40 or more, and then smelt that for the lead?—A. No; we would not do that. When we get ore low in lead we smelt it direct for the copper always.

Q. You would never use any of those mixtures if low in lead unless each individual item had 40 per cent of lead; is that right?—A. Yes; that's right.

So that this record establishes that the Heggie formula is not generally applicable and that neither the relative nor individual lead and copper contents of matte, when ready for copper smelting, are uniform throughout the country, wherefore neither may safely be adopted as generally applicable.

The court views, therefore, that this record presents a case different from that presented in the Consolidated Co.'s case, which, for that reason, is not here controlling.

Primarily it may be said that this product does not fall within the general terms of either paragraph 152 or 153. It is not an "ore." It is a product of an ore. It is an ore so far processed by manufacturing manipulations that it has arrived at a new physical condition with a new name by which it is known to commerce and bought and sold— "matte." That Congress deemed it a product made from an "ore" rather than an "ore" is conclusively shown by the language of paragraph 461 and its predecessors, wherein Congress enumerates "Copper ore; regulus *of*, and black or coarse copper, and copper cement; * * *." "Regulus *of*" copper ore is a product "of" or *from* and not copper ore. The proposition seems to so well accord with the common understanding that suggestion seems to amount to demonstration.

Nor is this matte any of the "lead" things enumerated in paragraph 153. All of these enumerations are prefixed by the word "lead." By all the rules of import customs interpretation, then, to come within that paragraph the merchandise must be at least in chief value of lead. The testimony indicates an apparent exception to the rule in that where the precious metals predominate in value in a matte that does not necessarily extrude therefrom the commercial denomination thereof by the name of the predenominating commercial metal, such as lead, copper, or antimony. Regardless of that question, since the copper in each case herein predominates in value over the lead, it is not reasonable that the merchandise should be denominated a "lead" article. Moreover, this court has held, and we think rightly, in the Consolidated Co.'s case, supra, that the words "lead in any form" in paragraph 153 are controlled by the

preceding enumerations, under the rule of ejusdem generis, which denies its application here as it did to the "matte" the subject of that decision.

To characterize the unassembled, detached, invisible, vagrant particles of lead inhabitant of a mass of *matte*, a "form" of lead seems to bid defiance to one's common understanding of that word. "Form" as typically defined in the Standard Dictionary (20th Century Edition) is as follows: "The outward or visible shape of a body *as distinguished from its substance* or color; the particular configuration by which an object is recognized by the sight or touch; * * * ." This lead content as imported, without any definite or ascertainable shape, which qualities can only be given it by application of the reclamation processes of roasting and smelting, in no sense responds to the call of that definition or the words of paragraph 153.

This conclusion, in the view of this court, really concludes the case. For the one and only debatable issue is, are the provisions of either paragraph 152 or 153 sufficiently definite and inclusive to be thereby penetrative of paragraph 461, providing for regulus of copper, and therein reach and thereby make dutiable the lead content of the copper matte or regulus made free thereby. If, as we have concluded, this material is not lead "ore" within paragraph 152 and is not "lead in any form" within paragraph 153, that question is conclusively answered in the negative, for in no event are those paragraphs applicable to or do they lay hold of these importations.

We are, therefore, prohibited its taxation for duty under either paragraph 152 or 153 save by similitude. But is it included in any other paragraph of the act directly? If so the rule of similitude finds no office here.

Paragraph 461 has a greater amplitude than is usually invoked. It provides not only for "Copper ore; regulus of" but accords free entry as well to "black or coarse copper." We have heretofore reviewed the history of this provision, which, during the course of more than a quarter of a century, has been held to include copper matte containing lead in varying quantities, often little short of its chief component material, Congress not only frequently reenacting the words in substance, but doing so in the knowledge that the Treasury Department, board, and courts had ruled *that such a reenactment by Congress in the free list of the words "regulus of copper" would permit such lead content of "copper matte" to be imported free of duty.* Spencer *v.* Philadelphia Smelting & Refining Co. (124 Fed., 1002). That the words "regulus of copper," therefore, include copper matte of any lead content less than its predominant component in value seems *stare decisis.*

That Congress so intended, is further shown by an understanding of the scope of the associate words of paragraph 461, "black or coarse copper." The relation of copper ore and its products is well epitomized in an instructive article upon "Copper" including its "Ores," "Metallurgy," and "Copper Smelting" in the Encyclopædia Brittannica (11th ed.). Therein it is in part said:

*Metallurgy.*—Copper is obtained from its ores by three principal methods, which may be denominated: (1) The pyrometallurgical or dry method, (2) the hydro-metallurgical or wet method, and (3) the electro-metallurgical method.

The methods of working vary according to the nature of the ores treated and local circumstances. The dry method, or ordinary smelting, can not be profitably practiced with ores containing less than 4 per cent of copper, for which and for still poorer ores the wet process is preferred.

*Copper smelting.*—We shall first give the general principles which underlie the methods for the dry extraction of copper, and then proceed to a more detailed discussion of the plant used. Since all sulphuretted copper ores (and these are of the most economic importance) are invariably contaminated with arsenic and antimony, it is necessary to eliminate these impurities, as far as possible, at a very early stage. This is effected by calcination or roasting. The roasted ore is then smelted to a mixture of copper and iron sulphides, known as copper "matte" or "coarse-metal," which contains little or no arsenic, antimony, or silica. The coarse-metal is now smelted, with coke and siliceous fluxes (in order to slag off the iron), and the product, consisting of an impure copper sulphide, is variously known as "blue-metal," when more or less iron is still present, "pimple-metal" when free copper and more or less copper oxide is present, or "fine" or "white-metal," which is a fairly pure copper sulphide, containing about 75 per cent of the metal. This product is resmelted to form "coarse-copper," containing about 95 per cent of the metal, which is then refined. * * * But though this or that process takes its name from the country in which it has been mainly developed, this does not mean that only that process is there followed.

The "English process" is made up of the following operations: (1) Calcination; (2) smelting in reverberatory furnaces to form the matte; (3) roasting the matte; and (4) subsequent smelting in reverberatory furnaces to fine or white metal; (5) treating the fine-metal in reverberatory furnaces to coarse or blister copper, either with or without previous calcination; (6) refining of the coarse-copper. * * * The "German or Swedish process" is characterized by the introduction of blast-furnaces. It is made up of the following operations: (1) Calcination, (2) smelting in blast-furnaces to form the matte, (3) roasting the matte, (4) smelting in blast-furnaces with coke and fluxes to "black" or "coarse-metal," (5) refining the coarse-metal. * * *

The impurities contained in coarse-copper are mainly iron, lead, zinc, cobalt, nickel, bismuth, arsenic, antimony, sulphur, selenium, and tellurium.

Therein and as was shown by the authorities relied upon in G. A. 5119 (T. D. 23656), quoted, supra, "coarse *metal*" and "black *metal*" are all included in the term "copper matte" as used in this country; and that term is in this country synonymous with regulus of copper. They are intermediate products of the smelter. The statute, however, also accords free entry to "black" or "coarse" "*copper*" which is the product of the smelter ready for the refinery, and which contains iron, *lead,* zinc, cobalt, nickel, and other impuri-

ties. If, therefore, we are to give some separate scope to all the words of this provision, there can be little doubt that Congress intended to embrace therewithin all copper ores and all copper products thereof in whatever state and in whatever form produced short of manufactures of copper. Whether the copper "matte" be a "leady" *copper* matte or otherwise designated *copper* matte, the term being synonymous with regulus of copper, which is used without limitation in the statute, is comprehensive of *all* "copper" mattes, including, of course, "leady" copper mattes.

It is significant that, while Congress in paragraph 461 of the current act accorded "regulus of * * * copper" free entry without in any wise limiting its lead content, in paragraph 144 of that act Congress, in prescribing the dutiable status of *matte* containing antimony, in full knowledge that mattes sometimes run very high in lead content, prescribed further of the antimony *matte*, as follows: "Matte containing antimony *but not containing more than 10 per centum of lead.*" Obviously, in this enactment Congress had in mind that *mattes* frequently, if not always, carried large lead contents; and, being so advised, in one part of the act limited that content to 10 per cent in legislating with reference to certain mattes, but, in another part of the act, placed no limit upon the lead content of copper *mattes*, or "regulus of * * * copper," long held the legal and commercial equivalent of copper *matte*. The congressional purpose, then, to not limit the lead content of regulus of copper or copper *matte*, is undeniable; and, until Congress so enacts, it is the duty of this court to decline to read into the act that which Congress, fully advised, did not do. While the improvement in smelting processes may have made copper *mattes*, previously unprofitable for their lead content, now so profitable, it is not the function of the court to revise or modify its previous and long consistent holdings in order to levy duty thereupon, but it is for the Congress to determine, first, whether or not it desires to so levy any duty, and, secondly, if so, then at what percentage of lead content and at what rate. Otherwise the courts legislate.

For these reasons the court is of the view that this record establishes the right of free entry of these importations.

*Reversed.*

(The late ROBERT M. MONTGOMERY, Presiding Judge, took no part in this decision.)

### CONCURRING OPINION.

BARBER, Judge: Upon the record I concur in the principle of this decision and in the judgment of reversal.

An important consideration leading me to the conclusion adopted in the case of United States *v.* Consolidated Kansas City Smelting &

Refining Co. (8 Ct. Cust. Appls., 226; T. D. 37495) was the understanding that the so-called "Heggie formula" was practicable and was of general application or readily susceptible of such.  It turns out that this formula is not of general use; that when used it is not constant in its application, but is varied according to wages and other conditions.  It is therefore of little importance in determining the issues here.

Then, too, the mattes in the last-mentioned case were radically different in components from these.  As pointed out in the opinion by Montgomery, then presiding judge, in one instance the value of the lead content was greater than that of the copper, and in every instance the value of the copper content was less than that of the silver.  While here, in every matte the copper content exceeds in value that of the lead, and excepting one importation, the copper content is the component of chief value in every matte.

The claims and concessions of counsel, however, seem to warrant the conclusion that the classification of mattes like these is not controlled by the presence of a precious metal exceeding in value that of the copper content.

SMITH, Judge, concurs in the foregoing.