UNITED STATES *v.* AYRTON METAL CO., INC. (No. 4389)[1]

United States Court of Customs and Patent Appeals, November 4, 1942

*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.
*Daniel P. McDonald* for appellee.

---

[1] C. A. D. 221.

[Oral argument October 6, 1942, by Mr. Weeks and Mr. McDonald]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, sustaining the protest of the importer against the classification by the Collector of Customs at the port of New York of certain merchandise described on the consular invoice and entered November 6, 1939, as tin lead alloy in slabs, a refund of all the duties collected thereon being awarded.

The merchandise is frequently referred to in the record as "white metal." According to the testimony of one of the witnesses for appellee it was imported "in pigs weighing about a hundred pounds each." The importation embraced approximately 50 tons. It appears that it was not manufactured from new metals but from reworked metals—in other words, it was reclaimed from scrap materials.

While, as stated, it was entered as tin lead alloy in slabs, the appraiser in describing the merchandise noted in red ink on the consular invoice "Solder Metal 2½c lb. Par. 392 46.3% lead 0.5% antimony— Remainder tin. Copper and zinc not more than trace." The notation so made was in conformity, as to percentages of ingredients, with the laboratory report of the chemist's analysis, which was introduced in evidence as Exhibit 1 and which reads:

The sample is solder metal containing:

| | Percent | | Imports |
|---|---|---|---|
| 46.3% lead | 46. 3 | Pb | 44. 85 |
| 0.5% antimony | . 5 | Sb | . 65 |
| Remainder, tin | 53. 2 | Sn | 54. 5 |
| | 100. 0 | | 100. 00 |

Copper and zinc not more than trace.

It will be observed that the tin content of the imported merchandise is greater in quantity than the sum total of the other ingredients, and it is agreed that tin is the ingredient of chief value.

The collector assessed duty upon the lead content of the merchandise at the rate of 2⅛ cents per pound, it being classified under paragraph 392 of the Tariff Act of 1930 which reads:

PAR. 392. Lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, antimonial scrap lead, type metal, Babbitt metal, solder, all alloys or combinations of lead not specifically provided for, 2⅛ cents per pound on the lead contained therein; lead in sheets, pipe, shot, glazier's lead, and lead wire, 2⅜ cents per pound.

The claim relied upon by the importer and sustained by the trial court is that the merchandise is duty free because properly classifiable under paragraph 1786 of the act, reading:

PAR. 1786. Tin in bars, blocks or pigs, alloys in chief value of tin not specially provided for, and grain or granulated and scrap tin, including scrap tin plate.

As finally formulated upon the basis of the record the specific issue presented is whether the merchandise is classifiable as "solder" within the meaning of that term as used in paragraph 392, *supra*, or "alloys in chief value of tin not specially provided for," as that clause appears in paragraph 1786, *supra*.

Both parties introduced testimony and the decision of the trial court, as we understand it, was based upon two grounds which may be summarized as follows:

First, that upon the evidence introduced, the merchandise in its imported condition, was not solder within the meaning of paragraph 392, *supra*, but solder metal, or a material, out of which to make solder, and, second (citing *Marks Lissberger & Son, Inc.*, v. *United States*, T. D. 49634, 73 Treas. Dec. 1035, and *United States* v. *Nassau Smelting & Refining Works, Ltd.*, 17 C. C. P. A. (Customs) 382, T. D. 43821), that paragraph 392, *supra*, is a lead paragraph; that articles to be classifiable thereunder must be in chief value of lead, and that articles in chief value of tin are excluded therefrom.

It is proper to say at this point that counsel for appellee in presenting the case before us did not stress the second ground but, in oral argument, virtually conceded that, as contended by the Government, the authorities cited in its support by the trial court were not controlling of the issue here.

Notwithstanding this attitude of counsel, however, we deem it necessary, in view of our conclusion as to the facts, to construe the paragraph so far as pertinent to this case.

By way of historical statement it may be said that the first *eo nomine* provision for solder appears to have been made in paragraph 393 of the Tariff Act of 1922, prototype of paragraph 392, *supra*, of the 1930 act here involved.

The *Nassau Smelting & Refining Works* case, *supra*, arose under the 1922 act. No question respecting solder was involved therein. As may be seen by reading the decision, (1) the merchandise was imported in the form of ingots which contain 13.50 per centum lead, 20 per centum tin, 1.50 per centum zinc, and 65 per centum copper, copper being the component of chief value; (2) the Collector of Customs assessed duty on the lead content of the ingots at the rate of 2⅛ cents per pound; (3) the controversy was presented to the courts upon the theory that the merchandise had been classified under the language of paragraph 393 of the act reading "* * * all alloys or combinations of lead not specially provided for * * *," and (4) was claimed by the importer to be properly classifiable (and, therefore, duty free) under paragraph 1555 of the act which provided for "Composition metal of which copper is the component material

of chief value, not specially provided for." We affirmed the import-
er's claim. Without specifically so stating we, in effect, held as:
controlling the decision of this court in the case of *Lang et al.* v..
*United States*, 10 Ct. Cust. Appls. 228, T. D. 38563 (38 Treas. Dec.
799), which arose under the 1913 tariff act, the parts of that decision
regarded as apropos being quoted.

The 1913 tariff act contained no *eo nomine* provision for solder and
there was no suggestion that the merchandise involved in the *Lang
et al.* case, *supra*, was solder. It appears from the decision that "The
importations were of so-called 'matte' varying in quantitative per-
centages of copper content from 22 to 52 per cent and in similar lead.
content from 17 to 57 per cent. * * * In each and all the copper
was greater in value than the lead content." A portion of the mer-
chandise was classified by the collector under paragraph 152 of the
1913 act which provided for "Lead-bearing ores of all kinds contain-
ing more than 3 per centum of lead * * *," and the remainder,
apparently, under the language of paragraph 153 of the act reading
"* * * lead in any form not specially provided for * * *,"
duty being assessed in both instances on the lead content. It was
claimed to be properly classifiable (and, therefore, duty free) under
paragraph 461 of the act as regulus of copper, and that claim was
sustained. It was said, in substance, that "regulus" and "matte"
were regarded as synonymous terms; that the matte involved was
(1) not an ore but the product of an ore and hence not classifiable
under paragraph 152, and (2) not within the meaning of "lead in any
form" specified in paragraph 153.

In construing paragraph 153, the decision recited, in substance, that
*all* the "things" enumerated in the paragraph were "prefixed by the
word 'lead'," and this was followed by the statement: "By all the
rules of import customs interpretation, then, to come within that
paragraph the merchandise must be at least in chief value of lead."
In that connection it was said that the copper matte involved was not
"any of the 'lead' things enumerated in paragraph 153," and that
"* * * since the copper in each case herein predominates in value
over the lead, it is not reasonable that the merchandise should be
denominated a 'lead' article." The precise language of the decision
expressing the foregoing thought was quoted by us in our decision in
the *Nassau Smelting & Refining Works* case, *supra*, and, after quoting
it, we said:

An examination of paragraph 393 shows it to be a lead paragraph, and we must
hold that it was not intended by the provision "all alloys or combinations of lead,
not specially provided for" to include such metal as is before us. It may be an
alloy in one sense and it may be a combination, but we do not regard it as an
alloy of lead or a combination of lead within the meaning of paragraph 393. It
is more an alloy of copper or a combination of copper than a lead article. It

must be remembered that the paragraph does not say "all alloys or combinations *containing* lead" but "alloys or combinations *of* lead."

Paragraph 392 of the Tariff Act of 1930 (which is the same as paragraph 393 of the 1922 act) differs from paragraph 153 of the 1913 act in that it enumerates several articles which are *not* prefixed by the word "lead," among them being solder, the only article with which we are here concerned. There was no occasion to comment upon this fact in our consideration of the issue involved in the *Nassau Smelting & Refining Works* case, *supra*, because, under our view as to the nature of the merchandise there involved, it, like that involved in the *Lang et al.* case, *supra*, was not any of the "things enumerated" in paragraph 393, whether or not the things were prefixed by the word "lead."

In the instant case the reason assigned in the *Lang et al.* case, *supra*, for excluding the copper matte, which was not in chief value of lead, from paragraph 153 of the 1913 act (that is, that it was not prefixed by the word "lead"), is not regarded by us as being applicable to solder under paragraph 392 of the 1930 act; nor should our expression in the *Nassau Smelting & Refining Works* case, *supra*, be so interpreted as to exclude an article having a substantial lead content, and falling legitimately within the definition of solder, from paragraph 392, even though such lead content be not the ingredient of chief value. From the context of the paragraph itself we feel quite confident that the legislative intent was to the contrary.

With respect to the *Lissberger & Son* case, *supra*, decided by the trial court and not appealed, it appears from the decision that the merchandise there involved was a character of solder dross obtained as a by-product in the manufacture of solder and while it contained considerable percentages of both lead and tin, it was not suited for solder in its imported condition, nor was it (probably by reason of the tin content) regarded as a lead dross in the sense of paragraph 392, *supra*. It was held to be classifiable under paragraph 1664 of the Tariff Act of 1930 and, therefore, duty free.

For the reasons indicated, we do not regard any one of the three cases discussed as controlling here, if the merchandise involved be, in fact, solder, and that question of fact we now proceed to consider.

Before discussing the evidence, it may be said that it is a matter of common knowledge, of which judicial notice may be taken, that there are various kinds and grades of solder adapted to different uses.

The 1939 edition of Webster's New International Dictionary gives the following noun definition of solder:

* * * 1. A metal or metallic alloy used when melted to join metallic surfaces; esp., an alloy of lead and tin so used. It is commonly applied by means of a soldering iron or a blowpipe, with a flux (as resin, borax, or zinc chloride) to cleanse the surfaces. Solders which melt readily are *soft soldrs:* other fusing at a red heat are *hard solders*.

Knight's American Mechanical Dictionary, vol. III, page 2239 (as quoted by the trial court) states:

Solders are distinguished by specific names, defining quality, composition, or purpose, as *hard, soft, white, spelter, gold, silver, copper, tin, plumber's, pewterer's, button,* etc.

*Hard* solders are such as require a red heat to fuse them; they are employed for joining brass, iron, and the more refractory metals. Soft solders melt at a comparatively low temperature, and are used with tin and lead, of which metals they are wholly or in part composed. Common tin solder, composed of 1 tin and 2 lead, is perhaps the best-known example of this class.    *    *    *

Solders

*Soft.*—For lead: tin, 1; lead, 1½.   For tin: tin, 1; lead, 2.   For pewter: tin, 2; lead, 1.

*Hard.*—For brazing, hardest: copper, 3; zinc, 1.   For brazing, hard: tin, 1; copper, 4; zinc, 3.   For brazing, softer: tin, 2; antimony, 1.

The brief on behalf of the Government before us cites a work by Charles Vickers, entitled "Metals And Their Alloys," which we understand to be a standard authority, and quotes therefrom the following:

A solder, according to a concise definition given in the "Chemical Dictionary" for 1919, is an alloy consisting of two or more metals having a melting point below that of any of the constituent metals, and used for joining other metals together by filling a joint or covering the juncture, as distinguished from brazing and welding.

Ordinary solder consists of equal parts of lead and tin, and melts at 188° C.; whereas the melting point of lead is 327°, and tin 230°.   Solders with melting points down to 95° are composed of lead, tin, and bismuth.

Solders are really metallic cements applied by being melted onto the surfaces to be joined to form a thin film or coating which is firmly adherent when cold.

   *      *      *      *      *      *      *

According to Milton L. Lissberger, solder is a mechanical mixture of lead and tin, and when a bar is passed under a buffing wheel—if it is as low a grade as 30% tin and 70% lead—the buffed surface will assume an appearance practically identical with a bar of second quality or reclaimed tin, while the buffings when subjected to analysis will be found to be almost pure lead.   *   *   *

At the trial counsel for the importer caused to be introduced in evidence as Exhibit 2 a public document issued May 31, 1932 (which, he stated, was obtained from the Bureau of Standards), entitled "Federal Standard Stock Catalogue Section IV (Part 5) Federal Specification For SOLDER; TIN-LEAD."

From that document, which bears the notation "QQ–S–571," * we quote the following:

This specification was approved for promulgation by the Federal Specifications Board on May 31, 1932, for the use of the departments and independent establishments of the Government in the purchase of this [solder; tin-lead] commodity,

---

*It has come to our attention that on February 11, 1942, another document bearing the notation "QQ–S–571a" superseding Fed. Spec. "QQ–S–571" was issued. The later issued document makes many changes in phraseology, but it has no bearing here and we make reference to it only that those reading this opinion may understand that "QQ–S–571" has been superseded.

and shall become mandatory for all departments and independent establishments of the Government not later than January 1, 1933. * * *

B. GRADES.

B-1. This specification covers six grades of tin-lead solder, as follows:.

Grade A
Grade B
Grade C
Grade D
Grade E
Grade F

C. MATERIAL AND WORKMANSHIP.

C-1. Grades A, B, C, and F solder shall be manufactured from new metals. Grades D and E solder may contain reworked metals.

D. GENERAL REQUIREMENTS.

D-1. Tin-lead solder shall be supplied in bars, ingots, or other shapes, as specified in the contract or purchase order.

E. DETAIL REQUIREMENTS.

E-1. Tin-lead solder shall conform to the requirements as to chemical composition specified in the following table:

| Grade | Tin plus lead (minimum per cent) | Tin (minimum per cent) | Antimony (per cent) | Copper (maximum per cent) | Sum of zinc, aluminum, and cadmium (maximum per cent) |
|---|---|---|---|---|---|
| A | 99.65 | 49 | [3] 0.12 | 0.08 | [1] None. |
| B | 99.65 | 44 | [3] .12 | .08 | [1] None. |
| C | 99.65 | 38 | [3] .12 | .08 | [1] None. |
| D | 97.50 | 35 | 1.25–1.50 | .15 | [2] 0.50 |
| E | 97.50 | 30 | .50– .75 | .15 | [3] .50. |
| F | 99.65 | 70 | [3] .12 | .08 | [1] None. |

[1] As determined on a 5-gram sample.
[2] Not more than 0.30 per cent of zinc, aluminum, or cadmium, individually, will be permitted.
[3] Maximum.

Under the subhead "Notes" the document states, "The solders covered by this specification are known commercially as 'soft solders'," and each grade is described with a statement of its intended use. With respect to grades D and E (which the document states may contain reworked metals) it is said:

I-5. Grade D solder is intended for ordinary plumbing and wiping purposes where fine finish and strength of joints are not required. It starts to melt at about 370° F. but is not completely liquid until about 415° to 440° F.

I-6. Grade E solder is intended for such work as dip work on auto radiators. It starts to melt at about 370° F. but is not completely liquid until about 460° F.

During the taking of testimony reference was made to specifications said to have been set forth in a book entitled "American Society for Testing Materials Standards." The book was not placed in evidence nor were the specifications referred to recited in the record.

With the foregoing as a background we now turn to the testimony and other evidence of record, consideration of same by us being made necessary by the Government's seventh assignment of error which is,

to the effect that the factual finding of the trial court is against the weight of the evidence.

Mr. George B. Oliphant, a witness called on behalf of the importer, who stated that he was a metal broker, testified, in substance, that he was employed by the importer to make sales of the imported merchandise and that he sold all or a part thereof in various quantities to different purchasers, 5 tons being sold to the Rochester Lead Works, of Rochester, N. Y., 5 tons to the Victory White Metal Co. of Cleveland, Ohio, and 10 tons to the National Lead Co. Sales to other parties were recited by the witness, but there was no other testimony concerning them, nor was any evidence presented showing what was done with or to the material purchased by those other parties.

Mr. Julius H. Sabo, who testified that he was assistant manager of the metal division of the National Lead Co. in Perth Amboy, N. J., was called as a witness on behalf of the Government but gave no testimony as to whether the merchandise purchased by that company was processed by it after being received at the company's plant. During cross-examination counsel for the importer directed his attention to what counsel stated was an affidavit by a Mr. Gesregan and was asked some questions based upon the instrument, but the instrument was not introduced in evidence, nor was Mr. Gesregan called as a witness. So, respecting what the National Lead Co. did with, or to, the merchandise there is no evidence of record.

Mr. Burt F. Ewell, who stated that he was president, production manager, and sales manager of Rochester Lead Works, Incorporated, was called as a witness by the importer, and there was also introduced as Exhibit 3 a deposition, taken upon interrogatories, of Mr. John N. Novasel, president of the Victory White Metal Co., who stated that his duties embraced "General supervision over all operations of the Company, including purchases and sales."

The importer sought to prove by the two latter witnesses that the merchandise as imported was not solder within the meaning of paragraph 392, *supra*, and it was the view of the trial court that this had been established.

It was testified by both Mr. Ewell and Mr. Novasel that the merchandise purchased by their respective companies was purchased upon specifications that it be composed of 54.50 per centum tin, 44.85 per centum lead, 0.50 per centum maximum antimony and approximately 0.15 per centum other impurities. Both witnesses testified that the metal which their companies received conformed to the specification upon which it was purchased, and same was accepted. The record does not disclose the specific name under which it was purchased.

It will be noted that the specification differs but little from the description respecting percentages given by the appraiser as quoted, *supra*.

Both Mr. Ewell and Mr. Novasel were interrogated with respect to the processing of the merchandise after it was delivered to their respective companies and were also asked to express, and expressed, opinions as hereinafter quoted.

The following is from the direct examination of Mr. Ewell:

Q. When this metal was received in your plant state just what process or processes it was subjected to in your plant.

\*   \*   \*   \*   \*   \*   \*   .

A. The metal was first melted and tried for purity; that is, poured into a bar to see what the bar looked like, whether it could be sold as a bar. It was found that the impurities in it were sufficient to make the bar not salable so the metal had to be refined by burning sulphur and resin to remove the impurities.

\*   \*   \*   \*   \*   \*   \*

Q. What impurities did you find, Mr. Ewell, in this metal?—A. The impurities that were revealed were zinc, antimony, and copper.

Q. Were there some other impurities or matter contained in this metal which you found necessary to remove besides zinc, copper and antimony?—A. No, sir.

Q. Did you find any oxidized impurities in this metal?—A. No.

Q. Can you give a little more detail about the impurities that were removed?—A. The metal is melted and while it is at a temperature of 450 degrees stick sulphur is added and the mixing machine is started in motion which stirs the metal and draws the sulphur down in the bath. That sulphur, of course, gives off a bluish flame, and it causes a matte to be formed at the top of the metal and the impurities, that is the copper, zinc, and the antimony, come up to the top in a matte and are then removed.

Judge DALLINGER. Skimmed off?

The witness. Yes, sir. Occasionally it is hard enough so as to be drawn off, or skimmed off.

Judge KINCHELOE. You call it a matte?

The witness. A matte, yes, sir.

  By Mr. McDONALD:

Q. Before converting this metal into some other product, did you find it necessary to remove those impurities?—A. Yes.

Q. Did you convert this metal received from the plaintiff to some other product?

\*   \*   \*   \*   \*   \*   \*

A. We did.

\*   \*   \*   \*   \*   \*   \*

Q. Into what product did you convert it?—A. Solder.

Q. Did you sell the solder in the market?—A. We did.

Q. After you had the impurities removed in order to convert this metal to a salable product state what further steps you took.

\*   \*   \*   \*   \*   \*   \*

Judge DALLINGER. What else did you do to it before you converted the metal into solder?

The Witness. Added virgin lead to it.

By Mr. MCDONALD:

Q. Basing your answer upon the analysis which you made of this metal when it was received in your plant and upon your experience of 20 years in the white metal trade, state whether or not. n your opinion the metal as received in your plant was a commercial grade of solder?—A. It was not.

Q. Basing your answer upon your experience in the white metals trade and upon the assay of the metal purchased by you from the plaintiff here, state what in your opinion such merchandise was.—A. Tin alloy.

The attention of the witness was then directed to the pamphlet QQ–S–571, quoted from above, it being then introduced in evidence. The witness stated, in substance, that he was familiar with the pamphlet; that it covers solder specifications for the Federal Government, including the Army and Navy, and that it is recognized in the white metal trade as authoritative. The following questions by counsel for the importer and the answers of the witness we quote verbatim:

Q. Mr. Ewell, I now invite your attention to the various grades listed under B–1, on page 1 of exhibit 2, and ask you to state how many grades of solder are indicated in exhibit 2?—A. There are six grades of solder indicated there.

Q. What are those grades?—A. Grades A, B, C, D, E, and F.

Q. In exhibit 2, is there anything there to help you distinguish what those grades are?—A. There is.

Q. On what pages does that appear?—A. On page 2, the second page.

Q. I ask you to examine the specifications for the various grades set forth in exhibit 2 on page 2, and to state whether or not the merchandise purchased by your concern fell at the time it was received in your plant within any of the grades set forth in exhibit 2?—A. It did not.

Upon cross-examination the witness testified that the impurities which were removed from the merchandise received at his plant, other than the antimony, consisted of "Copper, zinc, and a trace of iron" and that they were within the 0.15 per centum named as impurities in the specification upon which the merchandise was purchased. He stated that he was unable to give the respective percentages of such other impurities. As to the antimony removed, he stated that it was under the 0.50 per centum maximum named in the purchase specification.

He was then shown Exhibit 1, the report of the Government chemist's analysis, and was asked "if that report doesn't coincide with the specifications under which the metal was sold to you?" He answered, "It does."

The remainder of the cross-examination and the redirect examination, etc., related almost wholly to Exhibit 2, the pamphlet QQ–S–571, and in view of the weight which we think should be given it, we deem it proper to quote therefrom at considerable length:

X Q. * * * Exhibit 2 is Government specifications for solder?—A. Correct.

X Q. Are there any other grades commercially sold besides the grades in these Government specifications?—A. May I look at them and see what those grades are again? (The witness examines exhibit 2.)

Judge Dallinger. Do you understand the question?

The Witness. I do. That covers all the commercial grades that are sold.

By Mr. Fitzgibbon:

X Q. There are no other grades sold?—A. Not commercial grades.

X Q. I direct your attention to page 2 of exhibit 2 to grade E, where it states "Tin (minimum percent)—30 percent." Did the metal you bought have a minimum of 30 percent tin?—A. It did.

X Q. I direct your attention to the same page where it says, "Antimony (percent)—0.50 to 0.75." Did the metal you purchased come within that?—A. It did.

X Q. It also states there, "Copper (maximum percent) 0.15. Did the merchandise you purchased come within that?—A. It did.

X Q. It also states, "Sum of zinc, aluminum, and cadmium (maximum percent), 0.50. Does it state that there?—A. Yes.

X Q. Did the merchandise you purchased come within that?—A. It did.

X Q. Then there is a note (2) before that "0.50," and it states under that note, "Not more than 0.30 percent of zinc, aluminum, or cadmium, individually, will be permitted." Did the merchandise you purchased come within that?—A. I would not know. It was not analyzed specifically for those impurities; it was for the total impurities.

X Q. But the total impurities did not amount to more than 0.15 percent?—A. Correct.

X Q. And that gives an allowance of 0.30 percent. So it did come within that?— A. By inference.

X Q. So that your merchandise came within the government specifications for grade E solder?—A. It didn't come to those specifications.

X Q. I have just read to you each one of these things for grade E solder, and you have stated that your merchandise contained each one of them that is specified for grade E solder, isn't that right?—A. Yes; but in order to meet those specifications you have to change them.

X Q. I asked you if your merchandise that you purchased, as you purchased it from the importer, contained each one of these things, and you stated it did, did you not?—A. It was over 30 percent tin.

X Q. You agreed it came within each one of these items in the specifications for grade E solder.—A. I did.

X Q. As it was purchased by you from the importer?—A. Yes.

X Q. I ask you then did your merchandise come within the grade E specifications for solder as set forth in exhibit 2?

Mr. McDonald. I object unless he reads all of the specifications to him.

Mr. Fitzgibbon. I have read them.

Mr. McDonald. The very important point relates to whether it has reclaimed metals. That is very important. I object to the question.

Judge Dallinger. Objection overruled. I think this is proper cross-examination.

Mr. McDonald. Exception.

X Q. (Read by the reporter.) I ask you then did your merchandise come within the grade E specifications for solder as set forth in exhibit 2?—A. That doesn't mean it met those specifications.

Mr. Fitzgibbon. I move to strike out the answer as not responsive.

Judge DALLINGER. He is asking you whether this merchandise as you received it from the seller, whether it came within those specifications?

Judge KINCHELOE. You can answer that question yes or no. If you can't say so.—A. No; it did not.

By Mr. FITZGIBBON:

X Q. Will you refer again to exhibit 2, page 2? The first thing on the page is "Federal Standard Stock Catalogue."—A. Correct.

X Q. Under that is "Section IV, part 5,"—A. Right.

X Q. And under that is "E Detail Requirements." Does it say that?—A. It does.

X Q. Under that, "E-1. Tin-lead solder shall conform to the requirements as to chemical composition specified in the following table"; is that right?—A. That's right.

X Q. If you take grade E in that table: did the merchandise which you purchased from the importer come within each of the specifications of grade E?—A. No.

X Q. In that table?—A. No.

X Q. Which one didn't it come within?—A. Tin.

X Q. Didn't you have a minimum percentage of 30 percent tin in your merchandise?—A. Yes; it did.

X Q. Isn't that what is says there?—A. That isn't what it means in solder analysis.

X Q. Doesn't it say "Tin—minimum percent—30"; doesn't it say that?—A. Yes.

X Q. Did the merchandise you purchased have a minimum percentage of 30 percent of tin?—A. Yes.

X Q. Then it came within that specification?—A. Not for sale under those specifications.

X Q. Did it have a minimum of 30 percent tin?—A. It did.

X Q. Does that specification say 30 percent minimum of tin?—A. Yes.

X Q. Did it come within that?—A. No; not if it was sold——

X Q. I am not asking you whether you sold it, or what you did with it. I am simply asking you as you purchased it from the importer did this merchandise have a minimum of 30 percent of tin?—A. I answered yes.

X Q. Then it came within the specifications in this second column of that table, did it not, under grade E?—A. Yes.

X Q. It did?—A. Yes.

X Q. And it had an antimony percentage between 0.50 and 0.75, did it not?—A. It did.

X Q. Then it came within the specifications in the third column for grade E, did it not?—A. It did.

X Q. It had a copper maximum percentage of less than 0.15, did it not?—A. Yes.

X Q. Then it came within the fourth column of the specifications for grade E, didn't it?—A. Yes.

X Q. And it had a sum of zinc, aluminum, and cadmium, less than a maximum of 0.50 percent, did it not?—A. Yes.

X Q. Then it came within the fifth column of these specifications, did it not?—A. Yes.

X Q. Are there any other columns there?—A. No.

X Q. Have I asked you about everything in that specification for grade E?—A. Yes.

X Q. And you have answered that your merchandise as purchased came within each of those specifications?—A. Came within them; yes.

X Q. Now I call your attention to Grade D which is listed just above grade E. Did your merchandise as imported come within each of the figures in the columns for grade D?—A. It came within them.

X Q. It came within them for grade D?—A. Yes; that is grade D.

Mr. FitzGibbon. That's all.

Redirect examination by Mr. McDonald:

R. D. Q. I invite your attention to paragraph C of exhibit 2, denominated in this exhibit as "Material and Workmanship," and ask you to read the matter thereunder.—A. "C–1. Grades A, B, C, and F solder shall be manufactured from new metals. Grades D and E solder may contain reworked metals."

R. D. Q. Would you consider that the merchandise as received in your plant from the plaintiff herein as falling within Grade D or grade E as set forth in this Government circular, exhibit 2?—A. These are reworked metals——

Mr. FitzGibbon. I move that the answer be stricken as not responsive.

Judge Dallinger. It may be stricken.

By Mr. McDonald:

R. D. Q. Do you understand my question?—A. I am confused in some way.

R. D. Q. May be I can clarify the matter. Under "E" on page 2 of this Government circular which you hold in your hand is specified "Tin (minimum percent)—30."—A. Yes.

R. D. Q. How much tin did this merchandise have which you got in your plant?—A. 54.5 percent.

R. D. Q. Would you consider metal containing 54.5 percent of tin as falling within or complying with the tin specifications for grade E in this Government circular?—A. No.

R. D. Q. Why not? It has more in it, hasn't it?—A. It has more in it, but it doesn't meet these specifications when it has.

R. D. Q. Would having more than 30 percent tin cause this merchandise to fall outside of grade E?—A. Yes.

R. D. Q. Why would it be outside?—A. It doesn't meet the specifications.

R. D. Q. Wherein does it not meet the specifications?—A. In the tin and lead content.

R. D. Q. For merchandise actually to fall within Grade D or grade E, must it contain approximately the amount of lead and tin set forth in this schedule?—A. Yes.

R. D. Q. And if it contains 54 percent of tin necessarily the metal would not meet the lead and tin content set forth in this schedule for grade E?—A. No.

Mr. FitzGibbon. I object. No amount of lead is set forth in this schedule.

Mr. McDonald. It does set forth the amount of tin so by difference it gives the amount of lead.

Mr. FitzGibbon. I renew my objection and move to strike out the answer on the ground there is nothing about lead, as such, set forth in the schedule.

Judge Dallinger. He has apparently asked a mathematical problem, as I understand.

Mr. McDonald. That's right.

Judge Dallinger. I suppose the court might take judicial notice of it. The objection is overruled.

Mr. FitzGibbon. Exception.

By Mr. McDonald:

R. D. Q. I ask you to look over this table on exhibit 2, to look over the specifications and all the numbers, and to state whether any of the grades therein described closely approximate the metal received in your plant?—A. They do not.

R. D. Q. Which is the closest one to the metal you purchased?—A. Grade A on lead and tin.

R. D. Q. That has about 49 percent tin and 50 percent lead?—A. Yes; Grade A.

R. D. Q. Would you say, bearing in mind that the merchandise you imported according to the government analysis had 46 percent lead, would you say that the imported merchandise falls within or without grade A?—A. Without.

R. D. Q. Why without?—A. Because of the impurities.

R. D. Q. Did the fact it was reworked metal have anything to do with it being without grade A?—A. Yes; Grades A, B, and C of the Federal Specifications call for virgin metals.

R. D. Q. What about grade F?—A. Grade F calls for virgin metals.

R. D. Q. This metal as received in your plant, was it virgin metal or reworked metal?—A. Reworked metal.

Mr. McDonald. That's all.

Recross examination by Mr. FitzGibbon:

R. X Q. In this schedule under "E" on the second page, those percentages are maximum and minimum, are they not?—A. They are.

R. X Q. And the tin is given in the minimum percent, is it not?—A. Yes.

R. X Q. So that to come within Grade E it must have at least 30 percent tin, must it not?—A. Yes.

R. X Q. Isn't it a fact that the more tin you have makes a better solder?—A. No.

R. X Q. It is not a fact?—A. It is not a fact.

R. X Q. It makes a more expensive solder, doesn't it?—A. Yes.

R. X Q. You can use it to solder some things that you couldn't use to solder with a lesser percent of tin?—A. Yes.

R. X Q. A higher percent of lead makes a cheaper solder?—A. It does.

R. X Q. You can't use that to solder some of the things you could solder if it had a higher percent of tin and a lower percent of lead?   Isn't that right?—A. Yes.

R. X Q. That's why the Government specifications mentions that percent of tin?—A. No.

Mr. FitzGibbon.   That's all.

Re-redirect examination by Mr. McDonald:

R. R. D. Q. If metal is bought on specifications for a minimum tin content of 30 percent, and 54 percent tin content is delivered, metal containing 54 percent content of tin, would you say that was a good delivery?

Mr. FitzGibbon. I object to the question.   It doesn't provide for 30 percent tin; it provides for at least 30 percent.   I object to the question on the ground it is wholly immaterial whether it would be a good delivery.

Judge Dallinger. Objection overruled.

Mr. FitzGibbon. Exception.

A. It would not be a good delivery.

Re-recross examination by Mr. FitzGibbon:

R. R. X Q. Do you mean to say if you specified that the metal should be at least 30 percent tin and somebody sold you solder that you bought as containing only 30 percent tin and they gave you 80 percent, do you mean to say you wouldn't take it?—A. I didn't say that.

Mr. McDonald. I didn't ask such a question.

Mr. FitzGibbon. It means the same thing.   You asked him if it would be a good delivery.

By Mr. FitzGibbon:

R. R. X Q. Do you mean to say if you were a buyer of solder and you ordered 30 percent tin content, and they gave you 40 percent you would not take it?—A. You mean would my company take it?

R. R. X Q. Yes.—A. Or would our customers take it?

R. R. X Q. Would you take it?—A. I would take it; certainly.

By Mr. McDonald:

R. R. D. Q. Why?—A. Because it was worth more.

R. R. D. Q. Would your customers take it?—A. No.

R. R. D. Q. Why?—A. Because it would not work for their purpose.

By Mr. FitzGibbon:

R. R. X Q. Suppose they gave you no purpose and they were just buying solder, would they take it? Suppose they were going to convert it into different grades of solder, they would certainly take it?—A. They might take it under those circumstances.

## The following is from the testimony of Mr. Novasel:

(17) Please state whether or not you further processed or manufactured the said metal into another product. [A] Yes.

(18) If your answer to Direct Interrogatory No. 17 is in the affirmative, please state whether or not, before processing or manufacturing the said metal, you found it necessary to remove any impurities or in any way refine the metal in question. [A] Yes. Oxidized impurities, which had to be removed from surface when melted.

(19) If your answer to Direct Interrogatory No. 18 is in the affirmative, please state in detail the method used by you in refining or removing the impurities in question. [A] Metal was brought to a molten stage at about 600° Fahrenheit, and oxidized impurities on the surface removed.

(20) If your answer to Direct Interrogatory No. 18 is in the affirmative, please state what impurities were removed by you from the said metal before the same was converted into a finished product. [A] Oxidized impurities which included excess antimony, copper, arsenic and iron etc., were removed.

(21) Please state whether, before converting the said metal into a finished product, it was necessary for you to add any other metal or metals thereto. [A] Yes.

(22) If your answer to Direct Interrogatory No. 21 is in the affirmative, please state what metal or metals were added by you to said metal before converting the same into a finished product. [A] Virgin lead.

(23) Basing your answer upon your experience in the white metals trade, and upon the assay of the metal in question, please state whether or not in your opinion the metal as received by you from the Ayrton Metal Co., Inc., was a commercial grade of solder. [A] No.

(24) Basing your answer upon your experience in the white metals trade, and upon the assay of the metal purchased by your concern from the Ayrton Metal Co., Inc., in November, 1939, please state what in your opinion such merchandise was. [A] Tin alloy.

In addition to Mr. Sabo (to a portion of whose testimony reference has been made above) the Government introduced the testimony of Mr. George H. Bangs, sales manager of the Nassau Smelting and Refining Co. The record does not show that company to have been a purchaser of any of the imported merchandise and much of the evidence given by Mr. Bangs is in the nature of expert, or opinion, testimony, based in part upon Exhibit 1, the report of the Government chemist's analysis.

On direct examination Mr. Bangs stated, in substance, that as a traveling salesman he sold solder in sections of the United States east of the Mississippi River; that there are certain standards for solder; that "As a general proposition the standards followed are those asked for by the customer in his specifications"; and that "in the absence of any other specifications we follow the specifications of the American Society of Testing Materials" with which he stated he was familiar. The following we quote verbatim from his direct examination:

Q. I show you a book entitled American Society of Testing Materials Standards, and call your attention to page 607 of that book. On that page is there a schedule of specifications for solder?—A. There is a schedule of specifications for solder.

Q. Do you recognize them as standard specifications for solder?—A. In so far as these grades that are specified. But there many other grades that are not in these specifications here.

Q. I show you Exhibit 1 in the case at bar, which is the government chemist's analysis of the merchandise at bar, wherein it is stated that the merchandise consists of 46.3 percent lead, 0.5 percent antimony, and the remainder tin, copper and zinc, not more than a trace. Do you recognize that merchandise as solder?— A. Yes.

The testimony of the witness on cross-examination and redirect examination we also quote verbatim:

X Q. Mr. Bangs, in your business do you differentiate between metals from which solder is made and solder itself?—A. Absolutely, yes.

X Q. How would you refer to the metal from which solder is made?—A. That is known as several different types; drosses, new metals, tin bearing metals, and what is known as solder metals.

X Q. Would you refer to metal that has a small amount of impurities in it which would have to be removed before it would be considered solder as being solder metal?—A. Generally, yes, if the impurities there were insufficient so as to make it into a commercial grade of solder.

X Q. Have you a clear distinction in your mind between solder metal and solder?—A. Absolutely.

X Q. Would you mind stating what that distinction is briefly?—A. The distinction is this: with solder metal it is just as much the case with the impurities involved as it is the case of the mixtures involved, for example, the amount of tin and lead, and the antimony or zinc content which cannot be beyond a trace. The production man in getting the solder is not allowed to have more than 1.5 percent of that combination of the antimony and copper and zinc content.

X Q. Are you familiar with reclaimed metals?—A. Yes.

X Q. Isn't it a fact in refining those reclaimed metals so as to make solder out of it there are certain impurities that have to be removed?—A. Yes, sir.

X Q. Have you run across in your experience in connection with those reclaimed metals any dead material or spots that would show up in the metal after it was worked?—A. I don't know just what you are referring to by "spots."

X Q. In reclaiming lead doesn't it often happen that there are certain drosses or refuse materials that float when this material is put into a molten state?—A And that is taken off, yes.

X Q. And that has to be taken off before the metal can be marketed as solder?— A. True.

X Q. Isn't it a fact also that in dealing with such reclaimed metals it is necessary to add virgin lead?—A. No, sir; absolutely not.

X Q. In metal such as this before the court where the lead content is approximately 46 percent and the tin is approximately 53 percent, would you say ordinarily it would be necessary to add tin to bring this into any standard specifications for solder?—A. I don't get your question correct, I don't think.

X Q. In the merchandise before the court we have approximately 46 percent lead, and we have approximately 53 percent tin. In your experience and with reference to those percentages, would you say it would ordinarily be necessary to add lead to this kind of metal in order to produce solder falling within standard specifications?—A. No.

X Q. Are you familiar with the specifications gotten out by the Bureau of Standards for solder?—A. I think I am. Those are the same ones that are in the big book.

X Q. I show you exhibit 2, and ask you to look it over, and ask you to state whether you are familiar with that?—A. No, I have never seen this before. I haven't seen them in this form before, but I think they are contained in the general book. I think the same specifications are in there.

X Q. In your direct examination, I believe you testified, Mr. Bangs, that the merchandise before the court fell into certain specifications gotten out by the A. S. T. M., that is the American Society for Testing Materials.—A. I don't believe I so testified. I said I was familiar with the specifications, but that there are many other grades of solder besides those covered by that.

X Q. Now, I show you this table on page 607 to which you previously alluded and ask you to state within which one of these this metal falls?—A. It is none of these classifications there.

X Q. Do you know of any classification, or is there any standard authority within which this metal falls?—A. No.

X Q. Do you know what an alloy is?—A. I most certainly do.

X Q. Would you be so kind to state what, in your opinion, an alloy is?—A. An alloy is a mixture, a mechanical mixture, of two metals.

X Q. Is it confined to a mechanical mixture, or may it be chemical?—A. At certain points you can obtain a chemical mixture.

X Q. What would you say constitutes a tin alloy, an alloy of tin?—A. An alloy of tin is an alloy taken by —, Well, it may be an alloy of tin and copper. Certain articles can be alloyed with certain materials, and certain materials cannot be alloyed with them. You might have even an alloy of tin with steel in proper proportions.

X Q. Would you say that a metal containing approximately 46 percent of lead, ½ percent of antimony, and about 53 percent of tin would be a tin alloy?—A. It is an alloy containing tin which any solder is.

X Q. Would you say such an alloy would be in chief value of tin or in chief value of lead?—A. I would say its chief value is a utilitarian purpose.

X Q. I submit that is not responsive to my question, Mr. Bangs. You know the present market value of tin?—A. I certainly do.

X Q. What is that, about?—A. 51 cents a pound.

X Q. And the market value of lead is about what?—A. 5.85 cents a pound.

X Q. So if you know a mixture or a combination containing 46 percent lead and 53 percent tin, would you say that is in chief value of tin?—A. Certainly; in chief value of tin.

X Q. About ten to one?—A. Yes, in chief value of tin, about ten to one.

X Q. Can you give the court any clear distinction as to what, in your opinion, constitutes a tin alloy and what constitutes solder?—A. I don't think I can.

X Q. Isn't it a fact there are many kinds of solder which don't have any lead in them at all?—A. Yes, there can be solder that doesn't have lead in it.

X Q. Is there gold solder? Are you familiar with gold solder?—A. I am not familiar with precious metals at all.

X Q. Are you familiar with silver solder?—A. No.

X Q. How about aluminum solder?—A. No.

X Q. Do you know of any that contains no lead?—A. A copper and zinc alloy.

X Q. That has no lead in it?—A. No.

X Q. Do you know of any other?—A. No.

X Q. Have you ever sold any metal having the same constituents as the merchandise before the court?—A. I have sold 65 percent tin and 35 percent lead; I have sold 55 percent tin and 45 percent lead. Those would come within the limitation of this.

X Q. Did it have any copper and zinc in it?—A. I don't know. Ordinarily, you don't analyze for copper and zinc.

X Q. If your company received a metal such as this which is described in the chemist's report, would it market it in that condition?—A. We could market it in that condition.

X Q. Yes, but would you market it in that condition?—A. Yes.

X Q. Do you recall having marketed any such metal within the past few years?—A. Yes.

X Q. With these impurities in it?—A. To the best of my knowledge, yes.

X Q. But you know of no authority that sets forth any standard within which this particular metal falls?—A. No.

Mr. McDonald. That's all.

Redirect examination by Mr. FitzGibbon:

R. D. Q. You were shown Exhibit 2 which is the Federal Standard Stock Catalogue for Solder; Tin-Lead. On the second page there is a schedule of six grades, from A to F, and that schedule provides for the tin plus the lead jointly. Under Grade F of that schedule, or rather Grade E, the tin plus the lead should be 97.50 percent, the tin 30 percent minimum, the antimony one-half of 1 percent to three-quarters of 1 percent, and copper maximum .15 of one percent, and the sum of zinc, aluminum, and cadmium one-half of 1 percent; and that is set forth as solder. Now, reading you the analysis of the merchandise at bar which is 46.3 percent lead, one-half of 1 percent antimony, copper and zinc, not more than a trace, and the remainder tin, does that come within that specifications?—A. I would say, yes.

R. D. Q. It has been testified that some of the imported merchandise was purchased upon the following specifications, and that it came within these specifications: tin, 54.5 percent; antimony, one-half of 1 percent; other impurities, .15 of one percent; lead, 44.85 percent. Would you say that metal such as was made up of those specifications was solder?—A. Yes.

All that we regard as material in the testimony of Mr. Sabo, other than that already alluded to, is contained in the following questions and answers taken from his direct examination:

Q. I show you exhibit 1 in the case at bar which is a chemical analysis of the merchandise before the court and which shows that the merchandise consists of 46.3 percent lead, one-half of 1 percent of antimony, and the remainder tin, with the exception of copper and zinc, not more than a trace. Would you say that that merchandise came within what you know as solder?—A. Yes.

Q. If you had that merchandise in pigs, what would you do with it?—A. I would introduce it into a copper kettle and depending on the specifications of

the customer I would dilute it either up or down, and it would be cast according to the specifications of the customer.

Q. As solder?—A. As solder.

Q. And sold as solder?—A. And sold as solder.

Q. You would merely cast it in whatever form they wanted the solder in?—A. Correct.

Q. Without doing anything with it?—A. That's right.

The cross-examination of this witness was brief and elicited no testimony of importance.

Our reasons for setting forth the testimony at such length is that, from our analysis of it, we feel constrained to agree with the Government's contention that the factual finding of the trial court is against the weight of the evidence.

While Exhibit 2—the document QQ–S–571—is not necessarily controlling in customs procedure, we nevertheless feel that it is very pertinent here as an aid in determining what solder is. Importer's witness, Ewell, not only stated it to be recognized in the white metal trade as "authoritative," but said further that it "covers all the commercial grades [of solder] that are sold." It is true that the witness insisted, in general terms, throughout his entire examination, direct and cross, that the metal which he purchased did not fall within any of the grades specified in the document, but when cross-examined as to the specific percentages of the different ingredients in such metal he stated the obvious fact that in each instance such percentages fell within the *minimum limits* set forth in grades D and E, the grades which the document states "may contain reworked metals."

Taking, for analysis and comparison, the specification stated in the table for grade E, it provides for a *minimum* of "Tin plus lead" of 97.50 per centum, the *minimum* quantity of tin to be 30 per centum. Obviously, this would leave a percentage of 67.50 lead. The use of the word "minimum," however, precludes a holding that in order to meet the terms of the specification in the table the metal should have *only* 30 per centum tin and contain 67.50 per centum lead. If the imported metal had contained less than 30 per centum tin, it would not have met the specification of the table, but the fact that it contained *more* than 30 per centum tin does not, in view of the word "minimum" exclude it.

In a literal sense any merchandise which contains a *minimum of* 97.50 per centum of "Tin plus lead," the *minimum* tin content of which is not less than 30 per centum of the whole, would fall within the specification of grade E. The proportions of tin and lead, respectively, might differ, but if the merchandise contained a minimum of 97.50 per centum of tin plus lead, the proportions would not be material so far as meeting the specification for grade E is concerned, except that the proportion of tin would have to be 30 per centum or more.

There was, of course, a sound reason for allowing the wide range of variants in proportions of tin and lead. A solder of "tin-lead" character suited for one use may require more lead than tin, while a solder suited for another use may require more tin than lead, and the proportions of tin and lead may vary according to the intended use. As we understand it, there are instances in which antimony, copper, zinc, etc., may be desired ingredients. In other instances they, or some one of them, may not be desired, but their undesirability in such instances does not mean that the article of which they are ingredients is not solder.

Counsel for the importer has stressed the testimony of Mr. Ewell and Mr. Novasel to the effect that in preparing the products which their respective companies market certain impurities were removed and virgin lead introduced, and the trial court apparently gave much weight to this fact. We fail to see wherein this is of any particular importance, so far as the issue here is concerned. It may be observed that Mr. Novasel did not state what kind of product his company produced from the material, whether solder or something else, and neither of them stated how much virgin lead was introduced. Incidentally, it may be said that apparently there is some discrepancy between the testimony of those witnesses. Mr. Ewell stated that he did not find any oxidized impurities in the metal while Mr. Novasel said there were "Oxidized impurities, which had to be removed." This discrepancy is perhaps of no great importance, but it may indicate (assuming that Mr. Novasel's company processed the material into solder) that the respective companies were seeking to obtain different types of solder. Mr. Ewell was not asked the purpose to which the solder produced by his company was to be applied (stating that it was refined by his company so that it could be sold "as a bar"), and we have only the broad statement largely in the nature of opinion testimony that the metal received at his plant was not a "commercial" grade of solder.

On the other hand, we have the testimony of the two witnesses called by the Government (both of whom seem to have been as well qualified as were the two upon whose testimony the importer relies) to the effect that, in their opinion, the metal, as described in the Government chemist's report of analysis, was solder.

Counsel for the importer places much emphasis upon the fact that the Government witness, Bangs, on cross-examination, stated that he differentiated between metals from which solder is made and solder itself. It is true that the witness so testified, but other of his testimony as above quoted explained the distinction in a manner that is not in anywise out of harmony with his view that the imported merchandise was solder.

In this connection it may be said that the Government contended before us, citing some references to what were claimed to be standard authorities, that "solder" and "solder metal" are synonymous terms and are used interchangeably, but we deem it unnecessary to pass upon that question here.

Since all the material evidence in the case has been set forth above and speaks for itself, we deem it unnecessary further to analyze it or comment upon it.

Suffice it to say that, considering the record as a whole, we are unable to agree with the holdings of the trial court either as to the questions of law or the question of fact. We think the clear weight of the evidence establishes the fact that the merchandise in its imported condition was solder in the sense of that term as used in paragraph 392 of the Tariff Act of 1930.

Accordingly, the judgment appealed from is *reversed*.