GRANT & Co. (INC.) *v.* UNITED STATES (No. 2343).[1]

1. JUDICIAL LEGISLATION.

It is the province of the court only to declare what the law is, and not to anticipate legislative action or supply omissions by the legislative body.

2. SODIUM SULPHYDRATE.

Sodium sulphydrate, a chemical produced by the action of hydrogen sulphide upon sodium sulphide, used to denitrate cellulose esters in the manufacture of artificial silk, is not sodium sulphide under paragraph 67, tariff act of 1913, notwithstanding its similarity thereto. Its classification as a miscellaneous chemical compound under paragraph 5 follows.

United States Court of Customs Appeals, May 19, 1924.

APPEAL from Board of United States General Appraisers, G. A. 8697 (T. D. 39846).

[Affirmed.]

*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for appellant.
*William W. Hoppin,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument May 7, 1924, by Mr. Place and Mr. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges.

BLAND, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Board of General Appraisers which overruled the protests of the importer, which protests were filed against the collector's classification of the merchandise under paragraph 5 of the tariff act of 1913, at 15 per cent ad valorem. The appraiser's answer to the protest is as follows:

The merchandise is described on the invoice as sodium sulphydrate and consists of a chemical compound not sulphite of soda. It was returned for duty as a chemical compound at 15 per cent ad valorem under paragraph 5.

Paragraph 5 reads:

PAR. 5. Alkalies, alkaloids, and all chemical and medicinal compounds, preparations, mixtures and salts, and combinations thereof not specially provided for in this section, 15 per centum ad valorem.

It is claimed by the importer that the merchandise is properly dutiable at one-fourth of 1 cent per pound under paragraph 67 of the act of 1913, as follows:

67. Soda: Benzoate of, 5 cents per pound; chlorate of, and nitrate of, ½ cent per pound; bicarbonate of, or supercarbonate of, or saleratus, and other alkalies containing 50 per centum or more of bicarbonate of soda; hydrate of, or caustic; phosphate of; hyposulphite of; sulphide of, and sulphite of, ¼ cent per pound; chromate and bichromate of, and yellow prussiate of, ¾ cent per pound; borate of, or borax refined; crystal carbonate of, monohydrate, and sesquicarbonate of; sal soda, and soda crystals, ⅛ cent per pound; and sulphate of soda crystallized, or Glauber salts, $1 per ton.

---

[1] T. D. 40227.

There was no dispute in the testimony concerning the nature or use of the importation. Its chemical analysis was admitted to be as follows:

Sodium sulphydrate ($NaHS$)____ 55 to 60 per cent.

Sodium sulphide ($Na_2S$)_____ ⎫
Sodium polysulphide ($Na_2S_x$)___ ⎪
Sodium sulphite ($Na_2SO_3$)_____ ⎬ 5 to 7 per cent.
Sodium carbonate ($Na_2CO_3$) ___ ⎪
Sodium hyposulphite ($Na_2S_2O_3$), ⎪
  or thiosulphate_____ ⎭

Moisture ($H_2O$)_____ 25 to 30 per cent.
Other impurities_____ Balance.

It was not disputed that the material was used to denitrate cellulose esters in the process of manufacturing artificial silk, which process is described by General Appraiser Brown as follows:

Cotton is nitrated. The nitrocellulose so obtained is dissolved in a mixture of alcohol and ether which gives a so-called gluten. This is pressed through capillaries, minute openings, and gives a thread. This is afterwards denitrated by this merchandise.

The testimony shows that sodium sulphide causes the reaction required in denitrating the cellulose esters, but if used pure in its full strength, it weakens the fiber of the artificial silks; hence this mixture or preparation has been worked out to give a diluent effect so as not to injure the fiber by replacing one of the sodium atoms with an atom of hydrogen by treating sodium sulphide with hydrogen sulphide gas by this reaction:

Sodium sulphide.                    Hydrogen sulphide.                    Sodium sulphydrate.
$$Na_2S \quad + \quad H_2S \quad = \quad 2NaHS.$$

It is admitted by the importer, appellant, that the merchandise is not provided for by name in paragraph 67. Appellant urges that it should be classified thereunder because it is "within the spirit of said paragraph and is so by legislative intent." The importer does not deny that paragraph 5 is broad enough to cover the article, but insists that a reading of paragraph 67 would indicate that Congress intended to include in it all the compounds of soda (except borax), and that since the sodium sulphydrate under consideration is so closely related to sodium sulphide it is within the spirit of the paragraph and should be so declared.

There is no dispute in the record that the pure sodium sulphide would not be suitable for the purposes intended, and that the sulphydrate is produced by replacing the sodium atom by the hydrogen atom in order to "reduce the alkalinity of the sodium sulphide." Sodium sulphide is the potent agency desired in the process. It is not contended, however, that sodium sulphydrate is the same material as sodium sulphide. It seems to be conceded that the importation is a new article in commerce, and that no other use is known for it except in the artificial silk manufacturing process, which is a new industry. The literature of chemistry is practically silent on sodium sulphydrate.

It was contended by the importer in oral argument that had Congress known of its existence, and of its being an article of commerce, they would have included it by name in paragraph 67. It seems to us that they probably might have so acted under the assumed circumstances, and no doubt it would be a fit subject for legislative attention in the future, but it is the province of this court only to declare what the law is, and not to anticipate legislative action nor to supply omissions of the legislative body. The argument that Congress would have included this commodity had they known of its existence seems to strengthen the position that they did not intend at the time of enactment to include it by implication, since it is fair to assume that they did not intend to include a thing they knew nothing about. It does seem more probable that in the enactment of paragraph 5, which is a kind of chemical basket clause, they intended it to cover just such character of importations as the one under consideration.

The importer's counsel, in urging that his commodity comes within the spirit of paragraph 67, relies largely on the decision in Church of the Holy Trinity *v.* United States (143 U. S. 457), and the following is quoted from that very interesting case:

It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within the intention of the makers. This has often been asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. As said in Plowden, 205:

From which cases, it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter, they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances.

The Holy Trinity Church, a corporation, contracted with an alien minister of the gospel residing in England to remove to the city of New York and enter into its service as rector and pastor. The act of February 26, 1885 (23 Stat. 332, ch. 164), made it unlawful for any corporation, etc.—

in any manner whatsoever to prepay the transportation, or in any way assist or encourage the importation or migration of any alien * * * into the United States * * * under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien, * * * to perform labor or service of any kind in the United States * * *.

It was conceded that the contract entered into with the minister called for labor and service. To say the least, the highest court of our land here indulged in a rather unusually liberal interpretation of the statute and declared the minister and his kind of service not to be included in the kind of aliens or the character of services referred to in the act.

Regardless of the weight we might be inclined to give this decision, under other circumstances, we do not think it is in any sense controlling in connection with the facts at hand where we are called upon, not to exclude something from paragraph 67, but to include something which at the time was not known to commerce. We know of no rule of any court, similar to the rule laid down in the Holy Trinity Church case, being judicially applied for the purpose of including an imported article in a given section of a tariff statute.

The importation fairly falls within paragraph 5 as a chemical compound, and the judgment of the Board of General Appraisers is *affirmed.*