(C. D. 1310)

WATERMAN STEAMSHIP CORPORATION
PAN-ATLANTIC STEAMSHIP CORPORATION } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 13, 1951)

Ambrecht, Inge, Twitty & Jackson (Francis H. Inge and Nicholas S. McGowin of counsel) for the plaintiffs.
David N. Edelstein, Assistant Attorney General (Richard H. Welsh and Harold L. Grossman, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: This case involves the question of whether or not 50 per centum ad valorem duty was properly assessed under the provisions of section 466 of the Tariff Act of 1930 on the expenses incurred in annealing parts of the cargo lifting gear upon 23 ships owned by the Waterman Steamship Corporation and 2 ships owned by the Pan-Atlantic Steamship Corporation during the period 1931–1939, inclusive. Duty was assessed upon the ground that the expenses incurred in annealing constituted a ship's repair upon which said duty was specially provided for under section 466. The plaintiffs contend that the annealing is simply part of a test or examination and is neither equipment of vessels nor repair parts in any sense, or materials therefor, or expenses of repairs within the meaning of section 466, which provides as follows:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.

Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:

"SEC. 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

"SEC. 3115. If the owner or master of such vessel furnishes good and sufficient evidence—

"(1) That such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination; or

"(2) That such equipments or parts thereof or repair parts or materials, were manufactured or produced in the United States, and the labor necessary to install such equipments or to make such repairs was performed by residents of the United States, or by members of the regular crew of such vessel,

then the Secretary of the Treasury is authorized to remit or refund such duties, and such vessel shall not be liable to forfeiture, and no license or enrollment and license, or renewal of either, shall hereafter be issued to any such vessel until the collector to whom application is made for the same shall be satisfied, from the oath of the owner or master, that all such equipments and repairs made within the year immediately preceding such application have been duly accounted for under the provisions of this and the preceding sections, and the duties accruing thereon duly paid; and if such owner or master shall refuse to take such oath, or take it falsely, the vessel shall be seized and forfeited."

At the trial the Government conceded that the amount of $234, which was included by the Government in the $13,442.35, is actually the cost or expense of testing, or inspection, or examination.

The evidence submitted by the plaintiffs consists of interrogatories propounded to Charles Hartley Delacourt Rogers, marine surveyor, naval architect and consulting engineer, acting as superintendent engineer with several English steamship companies.

He stated he was fully familiar with the requirements of the Factory and Workshop Act, 1901 (1 Edw. 7 c22), and the Docks Regulations made pursuant thereto, as to testing, inspection, and examination of ships' gear and that he was also familiar with the process of "annealing" as applied to ships' gear. The witness set out in his answer to the 10th interrogatory the extracts from Statutory Rules and Orders in the matter of testing, inspection, and examination of machinery, chains, and other ships' gear used in hoisting and lowering in connection with the loading and discharging of ships' cargo, as follows:

All machinery and chains and other gear used in hoisting or lowering in connection with the processes shall have been tested and shall be periodically examined. All such chains shall be effectually softened by annealing or firing when necessary and all half-inch or smaller chains in general use shall be so annealed or fired once in every six months. If the chains are part of the outfit carried by a seagoing ship it shall be a sufficient compliance with this Regulation as regards softening by annealing or firing of half-inch or smaller chains that no such chains shall be used unless they have been so annealed or fired within six months preceding. As regards chains, the safe-loads indicated by the test the date of the last annealing and any other particulars prescribed by the Secretary of State shall be entered in a register, which shall be kept on the premises, unless some other place has been approved in writing by the Chief Inspector.

A person shall not be deemed to be a competent person if and in so far as the Chief Inspector has given notice in writing that such person is in his opinion not technically qualified to carry out the tests, examinations or annealing required by these Regulations.

Certificates in the prescribed forms and containing the prescribed particulars with regard to the tests, examinations, inspections, annealing or other treatment required under Regulations 18, 19 (a) and (b) and 20 (a) shall be obtained and

entered in or attached to the prescribed register before the machinery, chain, rope or other gear to which the certificate refers is subsequently taken into use in connection with the processes.

The affiant further stated that the process of annealing consists in heating the metal to redness, that is, to about 1,400 degrees Fahrenheit, and cooling it slowly; that by subjecting the metal to heat in such manner, all paint, thick oil, grease, and other surface deposits are removed, so that the metal is left naked and any fractures or surface laminations are easily located, and at the same time any hardening effect of overstrain is removed. According to affiant, no other previous test is made, although an inspection is made to determine whether or not it should be annealed, but that part of the gear which is required to be annealed at certain periods is all subjected to the annealing process, whether it is thought necessary to do so or not; and that such ships' gear revealed by the annealing process to be faulty or defective is renewed or repaired.

The affiant further stated that any ships' gear made of malleable cast iron, steel hooks, and swivels, having screw-threaded parts, or ball bearings, or other case-hardened parts, would suffer by being annealed and is therefore exempt from the requirements, and subjected to visual examination only.

The form of the register of machinery, chains, etc., in which there must be kept a record of the occasions on which a ship's gear has been annealed, known as Form 99, was admitted in evidence as exhibit 1.

The affiant further stated that—

Twenty-seventh. To the twenty-seventh interrogatory he saith: All chains on ships are annealed, unless they are exempt, because they are always more than half-inch chains. The Regulation states that the chains require annealing or firing at certain periods, and this is done automatically before they are examined. Chains are annealed at the prescribed period to comply with the Regulations, and it is not until the chains have been subjected to heat treatment that it is possible to discover whether there are any defects or laminations which would call for renewal or repairs.

The articles exempt from annealing are described in interrogatory 29 as follows:

* * * Chains made of malleable cast iron, plate link chains, chains, rings, hooks, shackles and swivels made of steel, and hooks and swivels having screw-threaded parts or ball bearings or other case-hardened parts are not annealed, because the heat treatment would destroy their strength and/or efficiency. A number of iron parts, such as hoops and smithed fittings on derricks, are annealed before they are brought into use, when the derricks are made, but the derricks are not dismantled to this extent for the purposes of further annealing at intervals, and it is these parts that are also exempt.

According to affiant there are not any instances when all chains, rings, hooks, shackles, and swivels in general use, and other than those

mentioned above, and other than those used solely in hoisting appliances worked by hand, are not annealed at least once in every 12 months.

In answer to cross-interrogatories, the affiant described the process of annealing as follows:

\* \* \* Methods of annealing vary and some have certain disadvantages, but the best is that known as "close annealing." The chain or article to be annealed is placed in a gas or oil fired muffle furnace, heated to redness out of contact with the air, and then allowed to cool slowly either in the furnace or by covering it with dry sand or ashes after removal. "Close annealing" prevents oxidisation and subsequent scaling of the surface of the metal and the chain is heated more uniformly than any other types of furnaces. Coal or coke may also be used for a "close annealing" furnace and a fire clay gas retort makes a good muffle for these furnaces. Slow cooling is essential in order to ensure ductility of the iron.

The affiant also stated that it is not a requirement of the law that the annealing be performed in the United Kingdom; that according to regulation 22 (a), the annealing is required only when the certificate shows the annealing is out of date. It is required, however, according to the witness, that a certificate be obtained in a form officially prescribed by the regulations which contains certain particulars, and that a form of official register is available in which such certificates can be recorded or kept. He added this should be available for production by a ship's officer when cargo working is to be carried out in a British port, that is to say, in the absence of such certificate, it would be unlawful to use the gear at a port in Great Britain.

The interrogatories propounded to Eric James Edward, Solicitor of the Supreme Court of Judicature, England, disclose that he is familiar with the law of the United Kingdom with respect to the testing of gear used for the purpose of loading and unloading ships in the ports of that country for the period from September 1931 through the year 1939.

Docks Regulations, 1934 (Factories Act, 1937), and a copy of section 23 of the Factories Act, 1937, submitted in response to interrogatory 8, were admitted in evidence as exhibits 2 and 3.

The affiant stated that he was familiar with the process of annealing as required by the regulations, and that the rules and regulations promulgated pursuant to the Factory and Workshop Act, 1901, have the force of law, being in effect repeated in the Factories Act, 1937.

In reply to cross-interrogatories propounded by the Government, the affiant described the process of annealing.

Collective exhibit 4, received in evidence on behalf of the plaintiffs, consists of certain original copies of the invoices for which the expense of annealing was billed to the plaintiffs, together with two sets of recapitulation sheets, one for each of the vessels involved, showing the

quantity of annealing performed on the equipment of each vessel, and one sheet for each plaintiff showing the total cost of annealing performed on the equipment of all the vessels of each plaintiff.

Counsel for the Government conceded that the items of annealing shown in collective exhibit 4 represent work done pursuant to the requirements of the British factory and workshop acts, *supra.*

Clarence Reed, operating manager of the Waterman Steamship Corporation, testified on behalf of the plaintiffs that he has held a master mariner's license for 29 years, sailing in that capacity during the years 1926 to 1937 and 1938 to 1943, and was a master of Waterman's ships touching at British ports, and familiar with the work done to the cargo lifting gear of such ships prior to the lifting of cargo in British ports; that when entering such ports, the vessels are boarded by the inspector for the factory laws and if he discovers that a vessel has not been previously at a British port, the discharge of the cargo is held up until such cargo gear is tested. When the gear requires testing, a contractor brings his gear from his shop, re-rigs the gear, taking the gear of the vessel ashore, and anneals and tests same, then returns it to the vessel and tests the whole assembly, the tested gear being stamped "a safe working load," all defective parts having been replaced.

The witness further testified that the process of annealing is simply heating the metal and cooling it off, that the purpose is to discover any defects, if any, and that the contractor doing the annealing is hired by the agent of the shipping company.

The witness further testified that there is no annealing done on cargo gear in the United States. In this country, when a shackle, a winch, chains, or a ring starts to show wear, it is renewed, and no tests are run. To his knowledge, the witness was of the opinion that annealing accomplishes no beneficial effect upon the ship's gear, because it does not make it work any faster or more efficiently, nor lift a heavier load; that no heavier allowance is made because of any strengthening caused by the annealing process.

Henry Hill, a naval architect, educated in England, testified on behalf of the plaintiffs that he knew of the process of annealing in testing ships' loading gear; that it restores the grain structure of the steel if it is deformed and will serve a secondary purpose of cleaning for inspection, making the defects visible, but it will not disclose any interior defects. The witness would not go so far as to say that annealing would make a chain better than it was before the process; that if it were in need of improvement, it might improve it; that annealing would not increase the lifting load of the gear. It was his opinion that hoisting apparatus would not require an annealing every year.

On cross-examination, the witness testified that, if steel is subjected to excessive stresses over a long period of time, the structure of the steel changes, and it can be restored only by annealing, but normally ship's gear has not been subjected to heavy stresses over a substantial period of time before entering a British port. The witness amplified his statement by adding that "Even if they were in use all year I doubt they would require annealing because the stresses are of such a low order that that steel is not suffering from fatigue or anything."

JUDGE COLE: Here is what I want to know: now, when the gear is removed from the ship and goes over across the street to be annealed.

THE WITNESS: Yes.

JUDGE COLE: No human being can tell by looking at it whether it needs the grain restored or not?

THE WITNESS: Exactly.

JUDGE COLE: But when it goes through the annealing process if there happens to be some fracture there which needs the grain restored.

THE WITNESS: Yes.

JUDGE COLE: That would take place and you wouldn't know whether it was necessary or not?

THE WITNESS: The grain structure you can only examine, your Honor, under a microscope. You edge it off smooth and then you take a look at it under the microscope. It is impossible to tell with the naked eye what the grain structure is and if the thing is cracked annealing won't do it any good; it just has to be renewed. (Record, pp. 81 and 82.)

The witness insisted that the chances of steel being subjected to overload are remote because the stresses are induced in the first place by a winch, and the lifting power of that winch is definite and cannot go above a certain limit, and in the course of a year such equipment would definitely not need repairing. The witness also was definite in his assertion that a winch designed to lift a certain load would refuse to lift a heavier load, although the gear is tested to lift twice the load the winch is designed to carry.

JUDGE COLE: Mr. Hill, what would you say, in your opinion, is the primary reason or purpose of annealing?

THE WITNESS: You mean annealing, as such, your Honor?

JUDGE COLE: As you described it.

THE WITNESS: The primary purpose of annealing is to restore the original structure and the characteristics of the metal.

\*　　\*　　\*　　\*　　\*　　\*　　\*

JUDGE COLE: As I understand your previous testimony, it is conceivable that annealing takes place even when there is no need for the structure to be restored?

THE WITNESS: That is right.

JUDGE COLE: And if it is restored you have no way to tell whether it was or not?

THE WITNESS: That's right. (Record, pp. 87 and 88.)

The witness was referring to the general purpose of the process of annealing. He had no knowledge of the annealing performed in English ports although he was positive that hoisting gear was not likely to be so abused that annealing of the metal would be necessary in order to restore it to its original grain structure.

Counsel for plaintiffs contend that the costs of annealing were incurred simply because of the requirements of the English law, and it was not to be classed as "expenses of repairs" within the meaning of section 466, *supra*.

It is argued that the term "repairs" connotes restoration of something which had deteriorated, and the annealed gear in question was so treated because of the requirement by law rather than because of any deterioration and that any incidental benefit is not enough to bring the expenditures under the term "repairs."

Counsel for the Government contends in his brief that the cost of annealing the loading gear of the vessels involved herein comes within the provision for "the expenses of repairs made in a foreign country" in section 466, *supra*, citing *E. E. Kelly & Co.* v. *United States*, 17 C. C. P. A. (Customs) 30, T. D. 43322 (painting), and cites the definition of "repair," quoted therein; *American Mail Line, Ltd.* v. *United States*, 24 C. C. P. A. (Customs) 70, T. D. 48377; *H. E. Warner, Trustee, American Mail Line, Ltd.* v. *United States*, 28 C. C. P. A. (Customs) 143, C. A. D. 136; and *States Steamship Co.* v. *United States*, 60 Treas. Dec. 29, T. D. 45001.

Counsel for the Government further contends that "since the record clearly reveals that the expenses of annealing incurred herein were for the purpose of restoring the ship's gear to a complete or sound state after partial destruction or injury, and were for the further purpose of maintaining said ship's gear in a safe and sound condition, and since such acts have been held by the decided authorities to come within the common meaning of the term 'repairs,' this protest should be overruled."

The court has reviewed carefully the evidence and considered the briefs filed herein by counsel for both parties. Had the record established that the expenses of annealing were incurred in order to restore the loading gear of the various ships in question to its original state after partial destruction or injury, as counsel for the Government contends, there might have been some doubt as to the correctness of the position taken by the plaintiffs. However, counsel for the Government conceded that the annealing costs were incurred pursuant to the requirements of the British factory and workshop acts. The Factories Act, 1937, in evidence as exhibits 2 and 3, does not require that the annealing of loading gear be undertaken each year for the purpose of restoring it to its original state after partial destruction or

injury. On the other hand, it is clearly a preventative measure, designed to ascertain whether or not the loading gear is being maintained in a safe condition.

Judge Cole, presiding at the trial of this case, succinctly, but quite clearly, compared the inspection laws of Great Britain, pertaining to loading gear of vessels, to that of the automobile inspection laws enacted in some of these United States. If such inspection revealed defects, repairs would be required before a new certificate is issued. Neither the inspection of an automobile nor the annealing process, applied to the loading gear, may be described as a restoration after decay, waste, injury, or partial destruction. Neither the automobile nor the loading gear was mended, made over, or restored to a sound state. All that is done to the automobile is to apply tests to ascertain the present condition of the various parts so tested. The only reason why the loading gear of ships is annealed is to clean off the accumulation of oil, etc., adhering to the steel so as to more readily ascertain the present condition of the parts or articles subjected to such process. Neither would come within the definition of a repair.

In the cases of *States Steamship Co.* v. *United States*, 64 Treas. Dec. 1003, Abstract 25674, *American Hawaiian Steamship Co.* v. *United States*, 71 Treas. Dec. 1174, Abstract 36292, and *States Steamship Co.* v. *United States*, 73 Treas. Dec. 718, T. D. 49531, the cleaning of certain deep tanks was held not to come within the definition of repairs to vessels.

The evidence produced by the naval architect to the effect that annealing restores the grain structure of steel in case it is deformed is not of consequence here, first, for the reason that no deformation was claimed by either party and, second, for the reason that the uncontradicted evidence establishes that loading gear could not possibly become so deformed with use during a year.

It having been clearly established by the evidence that annealing loading gear, undertaken by reason of the requirements of the laws of the British Empire, before a vessel may unload its cargo in the ports thereof, is in the nature of cleaning processes rather than a restoration after injury or decay, it is the holding of this court that duty was erroneously assessed upon the costs thereof under the provisions of section 466, *supra*.

Judgment will therefore be entered in favor of the plaintiffs directing the collector to reliquidate the entries and refund all duties taken upon the costs of annealing said loading gear pursuant to said section.