(C.D. 2514)

NORTHERN STEAMSHIP COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 16, 1965)

*Summers, Howard & LeGros* (*Richard W. Buchanan* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

Before DONLON and RICHARDSON, Judges

RICHARDSON, Judge: The issue involved in this case is whether certain work performed on the SS *Hawaiian Logger*, a vessel documented under the laws of the United States and owned by Northern Steamship Company, Inc., by an independent contractor, Apolo Marine Syndicate, in Calcutta, India, between January 16 and 22, 1961, is properly dutiable under section 466 of the Tariff Act of 1930 as equipment or repairs made in a foreign country upon a vessel documented under the laws of the United States. Said section provides:

* * * The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

This case has been submitted upon a stipulation of fact and the deposition of Igor A. Rosenquist, who was employed as second officer aboard the *Hawaiian Logger* during the period involved herein.

Invoices "A" and "B," attached to the stipulation, describe the work done on the vessel in Calcutta. Plaintiff conceded that items No. 1, 2, and 3 of invoice "A" were properly classified as "expense of repairs" and the Government conceded that items No. 4, 5, 6, 7, 10, 11, and 12 of invoice "A" were excluded from the provisions of section 466, *supra*, and were not dutiable.

The dispute centers on the following items as set forth on invoices "A" and "B":

INVOICE "A"

| | Description of Work | Rate | Rs. |
|---|---|---|---|
| 8. | Scraped, cleaned all the Rose Boxes and lifted up all rust in proper places and muds to Main Deck. Contracted for__ | 225. 00 | 225. 00 |
| 9. | Swept, cleaned all the Main Deck and placed all Iron rust in proper place. Contracted for_____ | 200. 00 | 200. 00 |

INVOICE "B"

| | Description of Work | Rate | Rs. |
|---|---|---|---|
| 1. | Breaking by Air Compressors and Pavement Breakers by special skilled workers the cement concrete and stone from No. 4 & 5 Lower Holds and lifted up all broken cement and stone chips to Main Deck. Contracted for_____ | 4875/. | 4875. 00 |
| 2. | Supplied 8 Gang of Riggs for the above purpose. Per Gang_ | 50/. | 400. 00 |
| 3. | Supplied 10 Winch Drivers for the above purpose. Contracted for_____ | 100/. | 100. 00 |

By deposition, read into the record, Igor A. Rosenquist, then second officer aboard the *Beaver State*, testified that he is a ship's officer in the merchant marine with an unlimited master's license for all oceans and any tonnage. (R. 6.) He had been second officer aboard the *Hawaiian Logger* during the period from January 16 through 22, 1961, while the vessel was in Calcutta, India. He stated that he had appeared before Notary Public Milton H. Soriano on December 19, 1961, and signed an affidavit for use in this case. He did not know where the original was but stated that, to the best of his knowledge and belief, the photostatic copy attached to the interrogatories as exhibit "C" was an exact copy of the affidavit he previously signed. He said that the facts and circumstances relating to the work performed by Apolo Marine Syndicate aboard the SS *Hawaiian Logger* were accurately and truthfully set forth in said exhibit "C" and that if called upon to testify, his testimony would be the same as that set forth therein. Counsel for the plaintiff stated that the original of the affidavit is in the file and was originally part of the protest. The original is in the file.

Mr. Rosenquist stated in the said affidavit that, in his capacity of second officer on the SS *Hawaiian Logger*, he was aware of all work performed on the vessel by either independent contractors or crew members, and that the cleaning, painting, and removal of ballast were performed between January 16 and 22, 1961, by Apolo Marine Syndicate in Calcutta, India, as indicated on invoices "A" and "B." He described the work done in connection with the items in dispute as follows:

(1) Item No. 8 concerns the routine scraping and cleaning of the Rose Boxes which are iron boxes containing perforations and are fitted at

the end of bilge suctions in order to prevent these pipes from being obstructed with solid matter. These boxes must be regularly cleaned of material there collected due to the straining process performed.

(2) Item No. 9 concerns the routine scraping and cleaning of the vessel's main deck. Said cleaning was not performed in connection with the chipping and scraping of rust and/or paint referred to in Item No. 1 since the removal of such rust and/or paint was contracted for and covered by Item No. 3.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

That in reference to Invoice "B" of Apolo Marine Syndicate attached hereto and dated January 22, 1961, consisting of three items, this work consisted solely of the removal of ballast from the #4 and #5 lower holds of the SS HAWAIIAN LOGGER. Prior to the time of removal, this ballast did not need to be discharged due to damage, age, wear or dilapidation, nor for the repair of any adjacent area on the vessel.

That all the aforementioned items, i.e. Items No. 8, No. 9 and No. 10 of Invoice A and Items No. 1, No. 2 and No. 3 of Invoice B consisted of routine cleaning, of removal of ballast and of securing the vessel for sea. This work in no way constituted a repair to the SS HAWAIIAN LOGGER, nor did it add any actual value to the vessel.

In answer to cross-interrogatories, Mr. Rosenquist stated that he was aware that grain had seeped into the Rose Boxes and that the work performed on the Rose Boxes consisted of sweeping out the material into cans, buckets, and other containers and depositing same on the deck for removal. Grain and dirt were removed, but the removal of rust was only incidental to the removal of wheat, dirt, and other foreign material which gathered in the bilges. There was no "scraping" of rust in cleaning the Rose Boxes. The Rose Boxes were cleaned for the purpose of readying the ship for the next cargo. Five Rose Boxes were cleaned of material with equipment provided in order to clean them; they were not scraped. The item described as sweeping and cleaning the main deck consisted of sweeping the main deck by large brooms, hand brooms, to remove wheat which had spilled all over the decks and the dirt mixed with the grain. A small amount of rust and chips was mixed in with other debris like the grain and was also removed. He did not agree that the chipping, scraping, and cleaning of iron rust described in item 3 of exhibit "A" resulted in this sweeping and cleaning. He stated that the iron rust described in item 9 was located in the Rose Boxes and adjacent areas of the cargo holds prior to removal. The Rose Boxes were not painted but were left exposed. The sweeping and cleaning of the iron rust on the main deck, described in item 3 (not here involved), were done for the purpose of disposing of the rust and corrosion which had accumulated and of restoring the main deck to a good condition.

The witness described the ballast located in Nos. 4 and 5 lower holds as concrete ballast, sacks of hardened concrete, which had

hardened after being poured into the holds. He did not know the reason for the removal of the ballast, but said it was not discharged due to any damage, age, wear, dilapidation, or for any repairs to adjacent areas of the vessel. (R. 21, cross-interrogatory No. 23.) The ballast was removed by the use of hand hammers and sledge hammers and crowbars. It was not necessary to replace any portion surrounding the ballast area after the removal of the ballast.

The first issue before the court is whether the work described as items No. 8 and No. 9 on invoice "A" constituted a "repair" under section 466, *supra*. The contractor described the work as scraping and cleaning of the Rose Boxes, lifting the rust and mud to the main deck, sweeping and cleaning the main deck, and placing the iron rust in the proper place. Mr. Rosenquist stated, in his affidavit, that the work involved a routine scraping and cleaning of the Rose Boxes to remove grain and dirt which had accumulated. In answer to cross-interrogatories, he said:

* * * From observation I was aware that the grain had seeped into the Rose Boxes. The cleaning gang swept the material out of the Rose Boxes into cans, buckets and other containers and deposited same on deck for removal.

\* \* \* \* \* \* \*

* * * The Rose Boxes were cleaned by removal of seepage of grain and dirt. The removal of rust was only incidental to the wheat, dirt and other foreign material which gather in the bilges of any ship.

\* \* \* \* \* \* \*

* * * There was no "scraping" of rust in cleaning of Rose Boxes.

According to the witness, in cleaning the deck, a small amount of rust and chips was removed as well as grain, dirt, and foreign matter. He admitted that the chipping, scraping, cleaning, and removal of iron rust described in item No. 3 (not here involved) were done for the purpose of restoring the deck to a good condition, but did not agree that the said operations resulted in the sweeping and cleaning referred to in item No. 9.

Plaintiff claims that these operations amounted to a routine cleaning, whereas defendant contends that they constitute a repair.

The meaning of the word "repair" was considered in *E. E. Kelly & Co. v. United States*, 17 CCPA 30, T.D. 43322, where the court held that maintenance painting was a repair. The court quoted the following definitions from Funk & Wagnalls New Standard Dictionary:

Repair, n. 1. The process of repairing; restoration after decay, waste, injury, or partial destruction; supply of loss; reparation; as, the *repair* of a building; often in the plural; as, to make *repairs* on a roof.

2. Condition after use; especially, good condition; condition after repairing; as, in what *repair* is the house?

The verbs "repair" and "maintain" are defined by the same authority as follows:

Repair, vt. 1. To mend, add to or make over; as, to *repair* a building.
2. To restore to a sound or good state; as, to *repair* health.
Maintain, v. 1. To hold or preserve in any particular state or condition; keep effective and from falling, declining, or ceasing; * * *.
2. To supply with means of support; provide for; sustain; keep up; * * *.

The court then stated:

While the involved painting was not occasioned by any damage or injury to the ship's structure, it was occasioned by deterioration and damage to the paint thereon. Paint is essential to the preservation of the ship's structure. When applied, it is a part of the ship. Whether the paint is destroyed by weather or by other causes is of little consequence. When destroyed, it must be restored. We are of opinion, therefore, that the language, "the expenses of repairs made in a foreign country," contained in section 466, *supra*, is sufficiently comprehensive to include money paid to the foreign contractor for labor performed in painting the ship.

This case was cited and followed in *American Mail Line, Ltd.* v. *United States*, 24 CCPA 70, T.D. 48377.

In *H. C. Gibbs* v. *United States*, 41 CCPA 57, C.A.D. 529, a vessel that was to carry charitably donated bulk grain for relief of peoples in certain European nations was painted prior to the voyage. That court held such painting a repair, stating (p. 60):

Considering the mission of the voyage in question, all of which appears to have been quite meritorious, it is easy for us to appreciate a desire of those responsible for the undertaking to have the appearance of the ship, meaning principally her outside condition, as presentable and attractive as possible in keeping with the laudable purposes of the shipment. The testimony is sufficiently strong to support a finding that the rust to which we have referred, to some extent at least, justified and made necessary a new paint job, and such testimony, as we view it, outweighs the other reasons assigned for such painting. In other words, we feel that the weight of the testimony is strongly in support of a finding to the effect that the painting of the ship's hull was done primarily because of the rusted condition, and therefore should be designated as a repair within the meaning of section 466, *supra*, as found by the trial court.

It has also been held that chipping, scaling, and wire brushing preparatory to painting is a repair, under section 466, *supra*, *States Steamship Co.* v. *United States*, 60 Treas. Dec. 29, T.D. 45001; *States Steamship Co.* v. *United States*, 73 Treas. Dec. 718, T.D. 49531.

Whether or not the cleaning of deep tanks in a vessel is a repair has been before the court on a number of occasions. *States Steamship Co.* v. *United States*, 60 Treas. Dec. 29, T.D. 45001; *States Steamship Co.* v. *United States*, 64 Treas. Dec. 1003, Abstract 25674; *American Hawaiian Steamship Co.* v. *United States*, 71 Treas. Dec. 1174, Abstract 36292. In the case first cited, it was held that the plaintiff had

failed to establish that the cleaning of the deep tanks did not constitute a repair. The court said (p. 31) :

> Considering first the question whether the cleaning of deep tanks constitutes a repair, it is observed that the testimony does not show precisely the nature of the cleaning. It does not appear whether the cleaning process was simply the removal of accumulated dirt, or whether it was a restoration of the inner portion of the tanks to a good condition after deterioration. It is clear, however, that the process, whatever it may have been, was quite elaborate. The cost as shown by the bill of the foreign contractor, amounted to yen 650, and from this fact it is safe to assume that such cleaning process included more than removing foreign substances in the tanks such as would be necessary to prevent the bean-oil cargo from becoming impure.

In *States Steamship Co*. v. *United States*, 64 Treas. Dec. 1003, Abstract 25674, there was evidence that in order to prepare deep tanks used for handling fuel oil so that they might carry vegetable oil, they had to be cleaned because the fuel oil would contaminate the vegetable oil. The court held (p. 1004) :

> From the evidence now before the court we are of the opinion that the picking up of fuel oil and dirt, the scraping and cleaning with kerosene oil, the washing down with oakite, and then with fresh water, and the drying out with cotton waste of the deep tanks in the steamer *California*, in order that they become suitable to contain a cargo of vegetable oil for transportation, do not constitute a repair, as provided for in paragraph 466, * * *.

The same result was reached in *American Hawaiian Steamship Co*. v. *United States, supra*, where fuel oil was consumed on the outward voyage and the tanks filled with vegetable oil on the homeward trip. The court stated that it was necessary to clean the tanks to prepare them for such cargo and described the operation as steaming for 24 hours, pumping out the sludge and residue, the insertion of a chemical cleaner to break down any residue, and wiping just prior to filling, to rid the tanks of moisture.

In *American Mail Line, Ltd*. v. *United States*, 34 Cust. Ct. 197, C.D. 1704, affirmed on rehearing, 35 Cust. Ct. 142, C.D. 1735, it was held that the charge for sweeping and cleaning the holds of a vessel and laying dunnage prior to the stowing of cargo was not dutiable under section 466, *supra*.

The annealing of ships' loading gear as part of the testing, inspection, and examination thereof required by the laws of the United Kingdom has been held not to constitute a repair. *Waterman Steamship Corporation et al*. v. *United States*, 26 Cust. Ct. 114, C.D. 1310. The court held that the annealing was in the nature of a cleaning process rather than a restoration after injury or decay.

In view of these authorities, the issue here narrows down to whether the work done on the Rose Boxes was only a removal of accumulated dirt and foreign matter or whether it constituted a restoration of the boxes to good condition after deterioration or decay.

Item No. 8 of invoice "A" describes the work covered as scraping and cleaning the Rose Boxes. Mr. Rosenquist, in his affidavit, referred to routine scraping and cleaning and said that the boxes must be regularly cleaned of material collected through the straining process performed. In answer to cross-interrogatories, he said that no scraping of rust was involved; that the removal of rust was only incidental to the removal of other matter; and that the operation was not done to remove accumulated rust and restore the boxes to good working condition, but to ready the ship for the next cargo.

The work described in item No. 9 involved the sweeping of the main deck and removal of the dirt, grain, and rust placed thereon as a result of the cleaning of the Rose Boxes.

From the evidence, it appears that the work done was a cleaning operation and not one involving the repair or restoration of the boxes because of deterioration and damage due to rust. Loose particles of rust would necessarily be removed in the course of sweeping out material which had accumulated in the boxes, but, according to the witness, there was no scraping done for the express purpose of removing rust.

It is significant that the charge for the work done under item No. 3 of invoice "A," described as chipping, scraping, cleaning, and removing iron rust from the main deck, amounted to 1,598 rupees, whereas the charges for both items No. 8 and No. 9 together amounted to only 425 rupees. This lends support to the view that the latter items involved cleaning only and not repair or restoration. *Cf. States Steamship Co.* v. *United States*, 60 Treas. Dec. 29, T.D. 45001, *supra.*

The next issue concerns the work described in invoice "B," consisting of the breaking up and removal of sacks of hardened concrete ballast. Defendant claims that ballast constitutes equipment within the meaning of section 466, *supra*, and that the removal thereof is dutiable since the installation of equipment is dutiable.

The following items have been held to be equipment: Temporary additional passenger accommodations (*Admiral Oriental Line* v. *United States*, 56 Treas. Dec. 234, T.D. 43585); dunnage mats (*Pacific & Atlantic Steamship Co.* v. *United States*, 2 Cust. Ct. 761, Abstract 41469; *American Mail Line, Ltd.* v. *United States*, *supra; American President Lines, Ltd.* v. *United States*, 30 Cust. Ct. 483, Abstract 57404); shifting boards and feeder boxes necessary for the transportation of grain (*R. P. Child* (*Pacific-Atlantic Steamship Co.*) v. *United States*, 18 Cust. Ct. 11, C.D. 1037; *H. C. Gibbs* v. *United States*, *supra*); empty grain bags used to hold a portion of a cargo of wheat to promote the stability of the vessel (*States Marine Corporation* v. *United States*, 42 Cust. Ct. 15, C.D. 2060).

Labor charges for the installation of equipment have been held dutiable under the section. *R. P. Child* (*Pacific-Atlantic Steamship Co.*) v. *United States, supra; American Mail Line, Ltd.* v. *United States, supra.* In the case last cited, the court pointed out:

\* \* \* The first sentence of section 3114 of the Revised Statutes, as amended by section 466 of the Tariff Act of 1930, provides for the assessment of duty on the equipments purchased for, the repair parts or materials used, and the expenses of repairs made on the vessel in a foreign country. The last sentence provides that compensation paid to members of the crew in connection with the installation of any such equipments or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or of such repairs. It has been noted that this statute is inartistically drawn (*United States* v. *Standard Oil Co. of California*, 27 C.C.P.A. (Customs) 334, C.A.D. 108), but it is evident that Congress intended that labor charges for the installation of equipment, unless paid to regular crew members, should be dutiable. [P. 201.]

The court held that the placing of dunnage mats aboard ship was not the installation of equipment but that the charges for bracing and securing general cargo were dutiable since the work appeared to be more in the nature of the installation of special devices than the laying of dunnage.

Under the cases cited, it appears that the placing of these bags of concrete, constituting ballast, is an installation of equipment and would have been dutiable under section 466, *supra*, if done in a foreign country by other than the ship's crew.

The question remains as to whether section 466 covers the removal of such equipment. That section refers specifically only to the cost of equipment and repair parts, the installation of equipment, and the making of repairs. Its wording indicates that Congress regarded the installation charges as part of the cost of the equipment purchased for the vessel and, therefore, dutiable if done abroad by other than crew members. Charges for removing such equipment at some later time are not ordinarily regarded as part of the purchase price, and there appears no reason for the court to infer that Congress so considered them. Defendant argues that if Congress intended to protect the American shipping industry by imposing a duty on the costs of installation, such a duty was required on the cost of removing it, if performed by foreign labor. Nevertheless, Congress did not make such a provision and we may not read into the statute words which are not there. *United States* v. *Marsching*, 1 Ct. Cust. Appls. 216, T.D. 31257; *Lang et al.* v. *United States*, 10 Ct. Cust. Appls. 228, T.D. 38563. It is not the province of the court to supply omissions of the legislative body. *Grant & Co.* (*Inc.*) v. *United States*, 12 Ct. Cust. Appls. 215, T.D. 40227.

It may be that Congress contemplated that the removal of equipment would usually involve repairs, which would be dutiable, but that is not the case here. The witness stated that the removal was not due

to any damage, age, wear, dilapidation, or for any repairs to adjacent areas, and that after removal of the ballast it was not necessary to replace any portion of the area that had surrounded it.

Under the circumstances here present, the removal of ballast is not dutiable under section 466, *supra.*

For the reasons stated, and in view of the stipulation, the protest is sustained, and the cost of the work described under items No. 8, No. 9, and No. 10 of invoice "A" and the cost of that described on invoice "B" are held not subject to duty under section 466 of the Tariff Act of 1930, *supra.* Judgment will be rendered accordingly.